PEOPLE *v.* MARXHAUSEN.

1. SEARCHES AND SEIZURES—ILLEGAL—WITHOUT SEARCH WARRANT —INTOXICATING LIQUORS—CONSTITUTIONAL LAW.

The entering of defendant's home, during his absence, without any search warrant, and by command of no court, and the search of his premises and the seizure of a quantity of liquor found thereon, was an unauthorized trespass and an invasion of his constitutional rights under section 10, art. 2, of the Constitution of Michigan.

2. SAME—CRIMINAL LAW—EVIDENCE—COLLATERAL ATTACK.

It is the general rule that when defendant in a criminal case for the first time upon the trial objects to the admission in evidence of articles taken by unlawful search and seizure, and they are admissible under general rules governing the admissibility of proof, the court will not pause in the trial to determine the collateral question whether the prosecution became lawfully possessed of such articles; but where it is made to appear before the trial that articles have been taken from the possession of the defendant in violation of his constitutional rights and by unlawful search and seizure and without any search warrant at all, it becomes the duty of the trial court to order the return of the articles thus unlawfully taken.

3. SAME—INTOXICATING LIQUORS—CRIMINAL LAW.

Upon motion to quash the information in a criminal prosecution under the "Damon Act" (Act No. 161, Pub. Acts 1917), charging defendant with illegal possession of intoxicating liquors, where the evidence taken before the examining magistrate and returned to the circuit court conclusively established the invalidity of the search and seizure, the trial court was not in error in directing the return of the liquor seized.

4. STATUTES—CONSTRUCTION—INTOXICATING LIQUORS.

The contention that the "Wiley Act" (Act No. 338, Pub. Acts 1917), prohibiting the manufacture, sale, keeping for sale or giving away of intoxicating liquors, except for certain purposes, was passed by the legislature to prohibit the dealing in intoxicating liquors, the business, while the "Damon Act," passed previously at the same

See notes in 59 L. R. A. 465; 8 L. R. A. (N. S.) 762; 34 L. R. A. (N. S.) 58; L. R. A. 1915B, 834.

session of the legislature, was to prohibit its private use, *held*, negatived by the use of the words "clerk, agent, or employee," in section 4 of the latter act.

5. SAME—CONSTRUCTION—REPEAL BY IMPLICATION.
   While repeals by implication are not favored in the law, where the later act covers the whole subject, contains new provisions evidencing an intent that it shall supersede the former law or is repugnant to the earlier act, it operates as a repeal.

6. SAME.
   The "Wiley Act," covering the field with minuteness of detail, expressly repealing all former acts inconsistent therewith, passed to put into effect the mandate of the people declared in the constitutional amendment, and dealing with the same subject-matter as the "Damon Act," *i. e.*, that of intoxicating liquor, *held*, to repeal the latter act.

7. CRIMINAL LAW — QUASHING INFORMATION — INTOXICATING LIQUORS.
   The motion to quash an information charging an offense under the "Damon Act," was properly granted, it having been repealed and superseded by the "Wiley Act."

8. SAME—COMMERCE—INTERSTATE COMMERCE—APPEAL AND ERROR.
   In reviewing the judgment of the court below quashing the information charging defendant with illegal possession of intoxicating liquors, upon writ of error under Act No. 159, Pub. Acts 1917, where the undisputed testimony shows that defendant purchased the liquor within this State when and where its sale and possession were lawful, this court will not consider the effect of Federal legislation upon the subject of interstate shipments of liquor (39 U. S. Stat. at Large, p. 1069).

Error to Wayne; Dingeman, J. Submitted January 17, 1919. (Docket No. 128.) Decided February 18, 1919.

August Marxhausen was bound over to the circuit court for an alleged violation of the liquor law. The information was quashed in the circuit court and the liquor seized ordered returned. To review this judg-

ment, under Act No. 159, Pub. Acts 1917, the people bring error.   Affirmed.

*Alex. J. Groesbeck,* Attorney General, *Charles H. Jasnowski,* Prosecuting Attorney, and *Edwin S. Bartlett,* Assistant Prosecuting Attorney, for the people.

*James McNamara* and *George A. Kelly,* for appellee.

*Henry E. Chase, amicus curiæ.*

FELLOWS, J.   Defendant is the owner of Calf Island, consisting of about 10 acres.  It is located in the Detroit river within the confines of Wayne county.   It is defendant's home.   On August 1, 1918, while defendant was in the State of South Carolina, and was known by the officers to be absent, five inspectors of the food and drug department, the marshal of the village of Trenton, a deputy sheriff of the county, and the justice of the peace, who afterwards conducted the examination of defendant, went to the island. Some of the party effected an entrance to the dwelling house without breaking locks or doors, searched the house, found some liquor there, and also found some liquor in an improvised cellar and at other points on the premises.   All the liquor was seized, conveyed to the mainland and from there to the county building in Detroit where it was stored.   All this was done without a search warrant and without consent of defendant.   Two days later a complaint was filed charging defendant with the violation of Act No. 161, Pub. Acts 1917.   Upon his return he was arrested, and after a preliminary examination before the justice of the peace who was one of the party on August 1st, was bound over for trial.   In the circuit court, the information was quashed and the liquor ordered returned to him.   To review this judgment the prose-

204—Mich.—36.

cuting attorney sues out this writ of error under the provisions of Act No. 159, Pub. Acts 1917. The following are the errors assigned:

"1. The court erred in deciding that Act No. 161 of the Public Acts of the State of Michigan for the year 1917 was superseded and repealed by Act No. 338 of the Public Acts of the State of Michigan for year 1917.

"2. The court erred in entering an order quashing the information.

"3. The court erred in directing the liquor seized to be restored to the defendant."

We shall consider these assignments of error in their inverse order.

1. Section 10, art. 2, of the Constitution of the State provides:

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation."

This provision is the same as found in the Constitution of 1850 (art. 6, § 26), and with the exception of the use of the word "person" in place of the word "individual" the same as found in the Constitution of 1835. It is in effect the same provision found in the Fourth Amendment to the Federal Constitution.

Section 16, art. 2, of the State Constitution provides:

"No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law."

Like provisions are found in the Fifth Amendment to the Federal Constitution. Similar provisions are found in the constitutions of the various States of the Union. By these provisions the rights of the individual are secured; the provisions of the Federal Con-

stitution securing the citizen from arbitrary, unlaw-
ful conduct on the part of the Federal government
and its officers, and the provisions of the State con-
stitutions securing the citizen from arbitrary, unlaw-
ful conduct on the part of the State and its officers.
These provisions not only secure the individual in his
person, his home, and his property from invasion
through unbridled legislation, but they also secure the
individual in his person, his home, and his property
from invasion through unbridled and unrestrained ex-
ecutive or administrative will. It ought not to be nec-
essary to recall the fact that it is of the essence of a
free government that the individual shall be secure in
his person, his home and his property from unlawful
invasion, from unlawful search, from unlawful seizure.
The writing of these provisions into the Federal Con-
stitution, into every constitution of every State in the
Union was not an idle ceremony. With a clearness
of vision our forefathers provided for a lawful search
and seizure, one supported by oath or affirmation, de-
scribing the place to be searched and the person or
things to be seized; and in the same section safe-
guarded the rights of the individual by inhibiting un-
reasonable and unlawful search. They provided an
orderly manner for search and seizure and prohibited
all others.

The substance of the provision found in the Fourth
Amendment to the Federal Constitution was proposed
by Mr. Madison in the seventh subdivision of his first
amendment. Others proposed a similar provision, and
the final result was the language found in this amend-
ment. That we may better understand this provision
it is well we consider some of the events leading up
to its adoption. Obviously we cannot within the com-
pass of this opinion detail at length all that preceded
and finally culminated in far reaching decisions by
the courts of England. Attention is directed to a

foot-note which will be found in Cooley's Constitutional Limitations (7th Ed.), beginning at page 426. It will suffice to say that a practice had grown up in England of issuing so-called writs of assistance, originally by the Star Chamber and later by the secretary of state, under color of which messengers of the king entered any and all places agreeable to themselves, searched and seized such papers and evidences as their will dictated. These writs were general in their character, described no premises and named no persons to be searched. Their justification at that time was the publication of seditious libels and the end sought the suppression of these seditious utterances. The practice of issuing and serving these writs was of long standing; and the right to issue them was unassailed for many years; indeed, this was one of the reasons assigned to sustain their validity in the case to which we shall presently refer. But Lord Camden disposed of this claim in the following language:

"But still it is insisted, that there has been a general submission, and no action brought to try the right.

"I answer, there has been a submission of guilt and poverty to power and the terror of punishment. But it would be strange doctrine to assert that all the people of this land are bound to acknowledge that to be universal law which a few criminal booksellers have been afraid to dispute."

The infraction of individual rights tolerated then as now under the claim of necessity in order to enforce the law finally came before the courts for decision. In the case of *Entick* v. *Carrington*, 19 Howell's State Trials, 1029, Lord Camden, pronouncing the judgment of the court, laid broad and deep the principles which were afterwards crystallized in the Fourth Amendment. Of Lord Camden's decision Mr. Justice Bradley, speaking for the court in *Boyd* v. *United States*, 116 U. S. 616 (6 Sup. Ct. 524), said:

"The law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution, and is quoted as such by the English authorities on that subject down to the present time."

Substantially contemporaneous with this case is that of *Money* v. *Leach,* 3 Bur. 1742. In both cases these general writs were held invalid and in April, 1766, the house of commons passed resolutions condemnatory of these so-called general warrants, whether for the seizure of persons or papers. Chatham thus tersely stated:

"Every man's house is called his castle. Why? Because it is surrounded by a moat, or defended by a wall? No. It may be a straw-built hut; the wind may whistle around it, the rain may enter it, but the king cannot."

The events bringing about the disuse of these writs in this country and premising the adoption of the Fourth Amendment are best described by Mr. Watson in his work on the Constitution. We quote (Vol. 2, page 1415):

"While officers of the crown were issuing and serving such warrants in England they were doing the same in the American colonies,—and this contributed much to that public sentiment which eventually demanded the adoption of this amendment. So oppressive had become the practice that here, as in England, it caused great alarm among the people, and here, as there, resistance was made to such writs on the ground of their illegality. These warrants were principally issued and the seizures made in the colony of Massachusetts. The trial which tested their legality occurred in Boston in February, 1761. It proved to be more than a mere trial, as we shall see, for the greatest question which could affect the interests of the

colonists was involved. James Otis, a native of Massachusetts, was advocate-general of the crown at Boston, a legal position of great responsibility and honor; but he was so wrought up at the outrage which had been committed by the arrests under these warrants that he resigned his office, and, though offered a most remunerative fee if he would take charge of the defense, he said: 'In such a cause as this I despise a fee.' He then acted as one of the counsel in resisting the arrests. He spoke for five hours, and it is doubtful if any legal argument ever made on this continent produced a more profound or lasting impression. He set fire to a torch which is still burning, and which will continue to burn, for in that masterful effort he impressed upon the American heart the great lesson of resistance to tyranny and outrage. As the result of the trial the writs were never afterwards served by judicial sanction."

A portion of Mr. Otis' speech will be found in Life and Works of John Adams, Vol. 2, page 523. In this speech Mr. Otis pronounced these general writs "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book," since "they placed the liberty of every man in the hands of every petty officer." In a letter to William Tudor written March 29, 1817 (Life and Works of John Adams, Vol. 10, page 244), John Adams most graphically described this trial which he attended. In the course of his letter he said:

"Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child of Independence was born."

These events which we have but given in outline occurred within the memory of the men who formulated and adopted the Fourth Amendment. In clear and unmistakable language these men wrote into the fundamental law of the nation to be afterwards incorporated into the fundamental law of the various States

of the Union the safeguard against unlawful and unreasonable search and seizure of the person and property of the citizen, irrespective of whether such unlawful and unreasonable search and seizure had the sanction of legislative approval or rested in the arbitrary will of the executive and administrative arm of the State. Does the search of defendant's premises and the seizure of his property in the instant case offend the rights secured to him by this provision of the fundamental law of the State? These officers had no search warrant issued upon oath or affirmation, no search warrant of any kind. They entered the home of defendant by command of no court, they searched his premises by virtue of no process. They justify, if at all, under administrative will and mandate not recognized by the Constitution, and unauthorized in a government of laws. That "the end justifies the means" is a doctrine which has not found lodgment in the archives of this court. The search and seizure detailed in this record was an unauthorized trespass and an invasion of the constitutional rights of this defendant.

These rights of the individual in his person and property should be held sacred, and any attempt to fritter them away under the guise of enforcing drastice sumptuary legislation (no matter how beneficial to the people it may be claimed to be), must meet with the clear and earnest disapproval of the courts.

Did the trial judge commit error in ordering the return of the liquor thus seized? It must be borne in mind that we are not here dealing with the search by a jailor of one lawfully under arrest upon warrant duly issued before placing him in his cell, and the retention of the proceeds of such search; nor are we considering a case where under a lawful search warrant duly issued a search and seizure has been effected; here we are dealing with the right to retain the

liquor taken without any search warrant. An examination of many cases decided by the United States Supreme Court involving both the Fourth and Fifth Amendments satisfies us that the rule announced by that court will be reached by careful consideration of three cases decided by that court, and only three; that by a careful consideration of these three cases we will be able to clearly understand the rule laid down by that, the court of last resort of the nation, and the reason for the rule. These cases are *Boyd* v. *United States*, 116 U. S. 616 (6 Sup. Ct. 524) ; *Adams* v. *New York*, 192 U. S. 585 (24 Sup. Ct. 372) ; and *Weeks* v. *United States*, 232 U. S. 383 (L. R. A. 1915B, 834, 34 Sup. Ct. 341). A brief statement with reference to each of these cases will aid in understanding the discussion which follows: In the *Boyd Case* an information was filed to forfeit 35 cases of polished plate glass. It was charged that the plate glass was imported by the owners in fraud of the customs laws. By the terms of the act under consideration such owners were liable to heavy fines and imprisonment. Pursuant to the provisions of the act the district attorney obtained an order of the court requiring the importers to produce their invoices of the shipment. It was held in an able and exhaustive opinion written by Justice Bradley that the proceedings were criminal, and that the act and the proceedings taken thereunder offended both the Fourth and Fifth Amendments. The opinion of Lord Camden in the case of *Entick* v. *Carrington, supra,* together with the circumstance surrounding the adoption of the amendments were fully considered by the court. Considering the compulsory production of papers it was said:

"And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of

a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

The *Adams Case* brought up for review the decision of the court of appeals of the State of New York (*People* v. *Adams*, 176 N. Y. 351 [63 L. R. A. 406, 68 N. E. 636]). The State court had held that upon the trial the manner in which competent evidence offered against the defendant had been obtained could not be inquired into. The State court had said:

"The underlying principle obviously is that the court, when engaged in trying a criminal cause, will not take notice of the manner in which witnesses have possessed themselves of papers or other articles of personal property which are material and properly offered in evidence. In the case before us, if there has been any illegal invasion of the rights of this defendant by reason of alleged unlawful searches and seizures of private papers, his remedy is in an independent proceeding, not necessary to be considered at this time."

The Supreme Court of the United States adopted this view and affirmed the case, Mr. Justice Day, speaking for the court, saying:

"The question was not made in the attempt to resist an unlawful seizure of the private papers of the plaintiff in error, but arose upon objection to the introduction of testimony clearly competent as tending to establish the guilt of the accused of the offense charged. In such cases the weight of authority as well as reason limits the inquiry to the competency of the proffered testimony, and the courts do not stop to inquire as to the means by which the evidence was obtained."

In the *Weeks Case* the defendant had been arrested at his place of employment. Other officers without a search warrant went to his house, and learning from

a neighbor where the key was kept, obtained it, entered the house, searched it and took away certain property including letters there found. Before the trial, defendant filed a petition praying the return of such property thus taken. The trial judge ordered the return of such property as was not desired to be used as evidence, but as to this property he denied defendant's petition. Before any evidence was offered defendant again moved for the return of the property so taken, which motion was also refused and the papers taken were received in evidence over defendant's objection. The conviction was reversed. Mr. Justice Day, who wrote the *Adams Case*, also wrote this case. Speaking for the court, he said:

"The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain convictions by means of unlaw-ful seizures and enforced confessions, the latter often obtained after subjecting accused persons to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights. * * *

"The accused, without awaiting his trial, made timely application to the court for an order for the return of these letters, as well as other property. This application was denied, the letters retained and put in evidence, after a further application at the beginning of the trial, both applications asserting the rights

of the accused under the Fourth and Fifth Amendments to the Constitution. If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution."

There has been some criticism of the *Boyd Case* by courts and writers who have regarded it as not in accord with a long line of cases in State courts of which the following will be found to be illustrative, although but a fragmentary list: *Gindrat* v. *People,* 138 Ill. 103 (27 N. E. 1085) ; *State* v. *Flynn,* 36 N. H. 64; *Commonwealth* v. *Dana,* 2 Metc. (Mass.) 329; *State* v. *Griswold,* 67 Conn. 290 (33 L. R. A. 227, 34 Atl. 1046) ; *State* v. *Burroughs,* 72 Me. 479; *State* v. *Miller,* 63 Kan. 62 (64 Pac. 1033) ; *Williams* v. *State,* 100 Ga. 511 (39 L. R. A. 269, 28 S. E. 624) ; *Commonwealth* v. *Tibbetts,* 157 Mass. 519 (32 N. E. 910). And after the decision in the *Adams Case* was handed down it was thought by some that the holding in the *Boyd Case* was modified thereby, notwithstanding it was expressly stated by Justice Day that:

"The case (*Boyd Case*) has been frequently cited by this court and we have no wish to detract from its authority."

We are impressed, however, that a careful consideration of the *Boyd Case* in connection with the *Adams Case* and the decisions of the State courts, some of which are cited above, but many of which are not, taken in the light of what was said by the court in the *Weeks Case,* demonstrates that in the main the United States Supreme Court and the courts of last resort of the various States are in accord, and that the *Boyd Case* does not conflict, as its critics claim, with the holdings of the many State courts. The

*Adams Case* and many State cases along the line of that case belong to one class of cases, while the *Boyd* and *Weeks Cases* belong to another class of cases. In the *Adams* and similar cases the question of the legality of the search and seizure was sought to be raised collaterally, not by direct proceedings. In these cases the objection was not made until the article or paper unlawfully seized was offered in evidence. It must be patent that upon the trial of a criminal case the court cannot pause in the trial when a bit of evidence, admissible under general rules, is offered, to engage in a collateral inquiry as to how the prosecution became possessed of such evidence. That would be the trial of a collateral matter, and as a general proposition the courts have so held, and where the evidence offered was competent, have not paused in the trial to determine the collateral issue of whether the evidence was legally secured or not. We say as a general proposition, because a few States are not in accord with this view. See *State* v. *Slamon*, 73 Vt. 212 (87 Am. St. Rep. 711, 50 Atl. 1097) ; *Wright* v. *State*, 9 Ga. App. 266 (70 S. E. 1126) ; *State* v. *Height*, 117 Iowa, 650 (59 L. R. A. 437, 91 N. W. 935) ; *State* v. *Sheridan*, 121 Iowa, 164 (96 N. W. 730), these cases holding that the question may be determined on the trial.

In the *Boyd* and *Weeks Cases* the question was not raised collaterally, but in both cases by a direct proceeding; in the *Boyd Case* by an affirmative order of the court requiring claimant to produce the invoice, which order was directly assailed in the review of the case in the Supreme Court, and which order was held to invade the claimant's rights under the Federal Constitution; in the *Weeks Case* by a negative order refusing the return of the property taken by the unlawful search and seizure, and which order was directly assailed upon review in the Supreme Court, and

which order was held by that court to have denied defendant his constitutional rights.

From this consideration of these cases it is obvious that the rule underlying them is that when defendant in a criminal case for the first time upon the trial objects to the admission in evidence of articles taken by unlawful search and seizure, and they are admissible under general rules governing the admissibility of proof, the court will not pause in the trial of the case to determine the collateral question of whether the prosecution became lawfully possessed of such articles; but that where it is made to appear before the trial that articles have been taken from the possession of the defendant in violation of his constitutional rights and by unlawful search and seizure and without any search warrant at all, that it then becomes the duty of the trial court to order the return to the defendant of the articles thus unlawfully taken. The rule is thus stated in 10 R. C. L. p. 933:

"The principle underlying the decisions admitting the evidence is that an objection to an offer of proof made on the trial of a cause raises no other question than that of the competency, relevancy and materiality of the evidence offered, and that consequently the court, on such an objection, cannot enter on the trial of a collateral issue as to the source from which the evidence was obtained. But since there is a right, there must of necessity be a remedy, and the remedy is to be found in the making of a timely application to the court for an order directing the return to the applicant of the papers unlawfully seized. On such an application, the question of the illegality of the seizure may be fully heard, and if the court erroneously refuses to order a return of the papers, and thereafter receives them in evidence against the applicant over his objection, it is an error for which a judgment of conviction must be reversed."

Turning now to our own cases we find them in strict harmony with the rule announced. This court has held

that the courts will not pause in the trial of a cause to open up a collateral inquiry of whether a wrong has been committed in obtaining information which a witness possesses. *Cluett* v. *Rosenthal*, 100 Mich. 193; *People* v. *Campbell*, 160 Mich. 108 (34 L. R. A. [N. S.] 58); *People* v. *Aldorfer*, 164 Mich. 676. But this court has also held upon an application made before trial for mandamus to set aside an order of the circuit court, permitting the police department to take possession of property of the citizen, pending investigation for crime and depriving the owner of its possession, that the order should be vacated and set aside, resulting in the return of the property thus unlawfully withheld: *Newberry* v. *Carpenter*, 107 Mich. 567 (31 L. R. A. 163).

In the instant case the evidence taken before the magistrate and returned to the circuit court conclusively established the invalidity of the search and seizure and the invasion of defendant's constitutional rights. The circuit judge did not err in directing the return of the liquor to the defendant.

2. We shall consider the first and second assignments of error together as they involve but one question. The trial judge was of the opinion that the act under which the information was filed was superseded by a later one and for this reason quashed the information. Act No. 161, Pub. Acts 1917, under which this information was filed, was approved May 2, 1917. It will hereafter be called the "Damon Act." Act No. 338, Pub. Acts 1917, was approved May 10, 1917. It will hereafter be called the "Wiley Act." Both acts by their terms became effective on and after May 1, 1918.

We shall first consider the argument advanced on behalf of the people that the Wiley Act was passed to prohibit the dealing in intoxicating liquors, the business, except for the permitted purposes, while the

Damon Act was passed to prohibit and prevent its private use. This is the foundation of the argument at the bar by the learned counsel for the people. It was forcefully presented and the people's case largely rests upon its soundness. A reading of section 4, however, convinces us that it cannot be maintained. This section provides:

"Any person who, himself or by his *clerk, agent* or *employee,* shall violate any of the provisions of this act," etc.

Clearly if the legislature by the Damon Act solely designed to prohibit and prevent the personal use of intoxicating liquors there would be no occasion to use the words *clerk, agent* or *employee.* The use of these words in the fourth section of the act, the penal section, eliminates the argument that the Damon Act was designed to cover and apply only to a field not contemplated by the Wiley Act.

The Damon Act simply prohibits, with a penalty for its violation, the bringing into, carrying, receiving or possessing of intoxicating liquors except for the permitted purposes, and by reference adopts applicable laws pertaining to search and seizure. It makes no attempt to provide for the lawful sale of liquors for medical, mechanical, chemical, scientific or sacramental purposes recognized in the constitutional amendment (Art. 16, § 11). Its absence of detail and definiteness might well have prompted the thoughtful legislator desiring to carry out the mandate of the constitutional amendment to insist upon a complete, comprehensive act, superseding it, and covering the entire field. While we may not inquire into the intent of the legislator we are bound to ascertain the legislative intent; and this we must determine by what was done by the legislature as an entity. If the subsequent act of the legislature operates to supersede the earlier act the

latter act must be accepted as the latest and final declaration of the legislative will.

The Wiley Act is a comprehensive measure of 61 sections completely covering the field and expressly repealing all acts or parts of acts in conflict with its provisions. It shows careful thought in its preparation, a recognition of constitutional rights without detracting from its virility. It provides in detail and definiteness the manner of sale of liquors for medical, mechanical, chemical, scientific and sacramental purposes, both by wholesale and retail, and prohibits all others.

Repeals by implication are not favored in the law. But where the later act covers the whole subject, contains new provisions evidencing an intent that it shall supersede the former law or is repugnant to the earlier act it operates as a repeal. In *Shannon* v. *People,* 5 Mich. 85, the rule was quoted with the citation of a large number of authorities in the following language:

"That where a subsequent statute covers the whole ground occupied by an earlier statute, it repeals, by implication, the former statute, though there be no repugnance."

In *Breitung* v. *Lindauer,* 37 Mich. 217, it was said by this court, speaking through Justice MARSTON:

"The rule is that the latter act operates to the extent of the repugnancy, as a repeal of the first, or, if the two acts are not in express terms repugnant, yet if the latter covers the whole subject of the first, and contains new provisions showing that it was intended as a substitute, it will operate as a repeal."

In *Attorney General* v. *Commissioner of Railroads,* 117 Mich. 477, it was said:

"While repeals by implication are not favored in the law, yet it is a rule of construction followed by this court and other courts that a statute revising the whole subject of a former statute, and intended as a

substitute, operates as a repeal of the former law, though it contains no words to that effect."

Chief Justice LONG writing for the court in *Porter* v. *Edwards*, 114 Mich. 640, said:

"The rule is well settled that a new statute covering the same ground as the former act supersedes it for all further cases, without the necessity of repealing words."

In *Graham* v. *Muskegon County Clerk*, 116 Mich. 571, it was said by Mr. Justice MONTGOMERY:

"That a later act which covers the whole subject repeals prior acts repugnant thereto is established doctrine."

See, also, *People* v. *Bussell*, 59 Mich. 104; *Feige* v. *Railroad Co.*, 62 Mich. 1; *People* v. *Furman*, 85 Mich. 110; *Attorney General* v. *Parsell*, 100 Mich. 170; *Board of Sup'rs of Saginaw Co.* v. *Hubinger*, 137 Mich. 72.

In the Wiley Act we have an act, carefully prepared, covering the field with minuteness of detail in many particulars, expressly repealing all former .acts inconsistent with its provisions, passed to put. into effect the mandate of the people declared in the constitutional amendment but recently adopted and fresh in the minds of the members of the legislature, dealing with the same subject-matter as the former act, that of intoxicating liquor, complete in itself, containing the latest expression of legislative will.

We are constrained to hold in view of the former decisions of this court that the learned circuit judge correctly held that it superseded the Damon Act.

3. Upon the argument it was insisted that by the so-called Reed amendment (section 5, Act of March 3, 1917, 39 U. S. Stat. at Large, p. 1069), congress had legislated upon the question of interstate com-

merce in intoxicating liquor, and that congress having occupied the field committed to it by the commerce clause of the Federal Constitution all legislation by the State upon the subject of interstate shipments of intoxicating liquor must fail. We do not find it necessary to consider this question. Upon this record it is undisputed that defendant purchased this liquor within this State when and where its sale and possession were lawful.

It follows that the judgment must be affirmed.

BIRD, C. J., and MOORE, BROOKE, STONE, and KUHN, JJ., concurred with FELLOWS, J.

STEERE, J. I concur in the conclusion that the "Damon Act" is repealed by the "Wiley Act," which is the controlling question involved.

OSTRANDER, J., did not sit.