## Commonwealth v. Eitler.

*Constitutional law—Unlawful seizure—Search warrants—Incidental seizure—Intoxicating liquors—State and Federal constitutional guarantees.*

1. Seizure of intoxicating liquors found in the home of a defendant, whose .house was being searched by State officers upon a search warrant legally issued to seize firearms, is a violation of the Pennsylvania constitutional guaranty against unreasonable searches and seizures. The guaranty of the Federal Constitution is practically identical, but applies only to Federal officers.

2. Warrants to search one's premises or possessions must conform strictly to the provisions of the Constitution and statutes. Unless they do so they are unreasonable and unconstitutional.

3. Pennsylvania statutes have not thus far provided for search and seizure of liquors under State authority.

4. Seizure of liquor discovered by State officers upon a search warrant to seize firearms is not "incidental seizure." Incidental seizure means the seizure of property directly connected with the offence charged, or the property described in the search warrant.

*Evidence—Illegally obtained evidence—Collateral inquiry.*

5. Pennsylvania courts will not suspend the conduct of a trial to enter into a collateral inquiry as to the means through which evidence, otherwise competent, was obtained.

Motion for new trial. Q. S. Dauphin Co., March Sess., 1922, No. 50.

*Maurice R. Metzger,* for motion; *Philip S. Moyer,* District Attorney, contra.

HARGEST, P. J., July 26, 1922.—The importance of this case extends far beyond the question whether the conviction of the defendant should be sustained. It involves the consideration of the constitutional guarantees against unreasonable search and seizure, and compelling the accused in a criminal proceeding to give evidence against himself, and also the consideration as to how these guarantees are affected by rules of evidence and procedure.

The defendant was tried and convicted upon an indictment charging him with the unlawful possession of intoxicating liquors for beverage purposes, in violation of section 30 of the Act of May 5, 1921, P. L. 407. On the trial it was shown that a State game warden had a search warrant for firearms, authorizing the search of the house occupied by the defendant in the Borough of Steelton, the defendant being an unnaturalized foreign-born resident of that borough. A member of the State police force and one or two other officers assisted in making this search. No firearms were found, but they found some loaded shells. They also found a quantity of raisin whiskey in

Commonwealth *v.* Eitler.

the cellar of the house, and smaller quantities in the kitchen and other parts of the house, which were shown to have a high alcoholic content. There was no charge against the defendant at the time for violating the liquor laws. During the trial the defendant objected to the introduction of the liquor in evidence, on the ground that it was illegally procured, without a search warrant therefor, and that to admit it in evidence was compelling the defendant to give evidence against himself. The objection was overruled, and, after conviction, the defendant made a motion for a new trial on the ground that the court erred in permitting the liquor seized on a search warrant authorizing a search for firearms only to be offered in evidence on the trial of this indictment, and also in permitting the State Game Warden and his fellow-officers to testify regarding information which they procured in making the search for firearms.

The 4th Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The 5th Amendment provides in part: "No person . . . shall be compelled in any criminal case to be a witness against himself."

The corresponding provisions in the Constitution of Pennsylvania are:

"Article 1, section 8. The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

"Article 1, section 9. In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself."

### Discussion.

1. Was the seizure of the whiskey illegal?

These constitutional provisions, like all of the others in the Declaration of Rights, are the safeguards against the oppressions which either our English forefathers suffered, or which the colonists endured, under English rule. Prior to the Revolution, a practice had grown up for the courts to issue blanket warrants authorizing the search of premises, houses and possessions, in order to obtain evidence of the commission of a crime and to arrest the person whom the evidence indicated had committed it. This practice was so inimical to the Anglo-Saxon notion of liberty that the judges of the higher courts denounced it as tyrannical. It led to the famous case of Entick *v.* Carrington, 19 Howell's State Trials, 1029, in which Lord Camden said: "To enter a man's house, by virtue of a nameless warrant, in order to procure the evidence is worse than the Spanish inquisition—a law under which no Englishman would wish to live an hour."

Shortly after this decision, the English House of Commons passed a resolution condemning the practice, and during the discussion of the resolution Lord Chatham said: "Every man's house is his castle. Why? Because it is surrounded by a mote or defended by a wall? No. It may be a straw-built hut, the winds may whistle around it, the rain may enter it, but the King cannot:" Boyd *v.* United States, 116 U. S. 616, 626; State *v.* Marxhausen, 204 Mich. 559, 3 A. L. R. 1505, 171 N. W. Repr. 557; Ash *v.* Com. (Ky.), 236 S. W. Repr. 1032; Cooley's Const. Lim. (7th ed.), 424, *et seq.*

2 D. & C.

The practice obtained in the colonies of issuing writs of assistance to the revenue officers, authorizing them to search suspected places for smuggled goods. A great trial occurred in Boston in February, 1761, wherein James Otis characterized this practice as "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book;" because, as he said, it placed "the liberty of every man in the hands of every petty officer."

Of this speech John Adams said: "Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child of independence was born:" Boyd v. United States, 116 U. S. 616, 625; 2 Watson's Const., 1415.

It is not surprising, therefore, that constitutional provisions such as those in our own Constitution are found in the constitutions of all the other states.

The importance of these constitutional guarantees has been emphasized in very many cases and text-books, a few of which are Gouled v. United States, 255 U. S. 298; Weeks v. United States, 232 U. S. 383; Ash v. Com. (Ky.), 236 S. W. Repr. 1032; Boyd v. United States, 116 U. S. 616; Adams v. New York, 192 U. S. 585; Burdeau v. McDowell, 256 U. S. 465; United States v. Rykowski, 267 Fed. Repr. 866; Rusher v. State, 94 Ga. 363, 21 S. E. Repr. 593; Hammock v. State (Ga.), 58 S. E. Repr. 66; State v. District Court (Mont.), 198 Pac. Repr. 362; United States v. Kelih, 272 Fed. Repr. 484; State v. Marxhausen (Mich.), 3 A. L. R. 1505, 1507, 171 N. W. Repr. 557; Atz v. Andrews (Fla.), opinion filed June 30, 1922, not yet reported; 24 Ruling Case Law, 718; Cooley's Const. Lim. (7th ed.), 424.

In State v. Marxhausen, 204 Mich. 559, the court said: "The writing of these provisions into the Federal Constitution, into every constitution of every state in the Union, was not an idle ceremony. With a clearness of vision our forefathers provided for a lawful search and seizure; one supported by oath or affirmation, describing the place to be searched and the person or things to be seized, and in the same section safeguarded the rights of the individual by inhibiting unreasonable and unlawful search. They provided an orderly manner for search and seizure and prohibited all others."

In Weeks v. United States, 232 U. S. 383, Mr. Justice Day said (page 392) : "This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions, the latter often obtained after subjecting the accused person to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution, to which people of all conditions have a right to appeal for the maintenance of such fundamental rights."

In Gouled v. United States, 255 U. S. 298, it is said (page 304) : "It has been repeatedly decided that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers:" Boyd v. United States, 116 U. S. 616, 635.

These constitutional provisions are binding upon the courts as well as upon legislatures and executive officials.

In 24 Ruling Case Law, 704, it is said that it is "the duty of the courts to denounce as unlawful every unreasonable search and seizure, whether con-

fessedly without any color of authority or sought to be justified under the guise of legislative sanction."

It is well settled that the provisions in the United States Constitution under discussion applies only to Federal officers: Weeks v. United States, 232 U. S. 383, 398; Boyd v. United States, 116 U. S. 616; United States v. O'Dowd, 273 Fed. Repr. 600; State v. District Court (Mont.), 198 Pac. Repr. 362; State v. Atkinson (So. Car.), 18 S. E. Repr. 1021; People v. Wicka, 192 New York Supp. 633; Gindrat v. People (Ill.), 27 N. E. Repr. 1085; 24 Ruling Case Law, 718; Hughes v. State (Tenn.), 238 S. W. Repr. 588, 590.

The provisions of the state constitutions, including Pennsylvania, are almost identical with those of the Federal. The guarantees preserved under one should be no different from those under the other. In most instances, the state courts have been as emphatic concerning the importance of these guarantees as the Federal courts, but, as we shall hereafter point out, the rules of procedure and evidence based upon reasons of public policy have made their impress upon, and somewhat circumscribed, the plain language of the constitutional reservation.

The prohibition against unreasonable search and seizure is not violated by the search of a person lawfully arrested: Weeks v. United States, 232 U. S. 383, 392; State v. Royce (Wash.), 80 Pac. Repr. 268; Hughes v. State, 238 S. W. Repr. 588, 594, 595; Ash v. Com. (Ky.), 236 S. W. Repr. 1032; 2 Ruling Case Law, 468.

So, also, the constitutional inhibition does not apply to one who consents to the search: Banks v. Com. (Ky.), 227 S. W. Repr. 455; Faulk v. State (Miss.), 90 So. Repr. 481.

Where, however, there is no consent and the search is not made of the person upon a legal arrest, warrants to search one's premises or possessions must conform strictly to the provisions of the Constitution and statutes. Unless they do so conform, they are unreasonable, and, therefore, unconstitutional: Gouled v. United States, 255 U. S. 298, 308; United States v. Slusser, 270 Fed. Repr. 818; State v. District Court (Mont.), 198 Pac. Repr. 362; Purkey v. Mabey (Idaho), 193 Pac. Repr. 79.

The important question is whether a search warrant legally issued, describing certain property, can be used to seize other property found in the execution of such warrant? Our Constitution provides that no warrant shall issue without probable cause or to seize things "without describing them as nearly as may be." When the warrant in this case was issued for firearms, it did not describe liquors. It must be assumed that there was no "probable cause" to search for liquors. It is no answer to this suggestion to say that our act of assembly does not authorize a search for and seizure of liquors. The Federal law does, and if there was any probable cause known to the State officials, the information could readily have been communicated to the Federal officials. The legislature has not thus far intended that there should be any search and seizure of liquors under State authority. Neither can it be said that this is what is spoken of in Weeks v. United States, 232 U. S. 383, 396, as an "incidental seizure." "Incidental seizure," as we understand the term, means the seizure of property directly connected with the offence charged against the defendant or directly connected with the property described in the search warrant. An exhaustive search among the multitude of authorities discloses no case in which the seizure of property entirely disconnected with the offence charged or the things described in the warrant has been justified, either as an incidental seizure or otherwise.

2 D. & C.

In Cooley's Const. Lim. (7th ed.), 429, it is said: "But as search warrants are a species of process exceedingly arbitrary in character, and which ought not to be resorted to except for very urgent and satisfactory reasons, the rules of law which pertain to them are of more than ordinary strictness; and if the party acting under them expects legal protection, it is essential that these rules be carefully observed. In the first place, they are only to be granted in the cases expressly authorized by law, and not generally in such cases until after a showing made before a judicial officer, under oath, that a crime has been committed, and that the party complaining has reasonable cause to suspect that the offender, or the property which was the subject or the instrument of the crime, is concealed in some specified house or place."

In Ash *v.* Com. (Ky.), 236 S. W. Repr. 1032, 1035, it is said: "Short-sighted statesmanship, in order to serve immediate purposes, sometimes places the end to be accomplished above the means employed, although the 'means' might involve the setting aside and a virtual repeal of a sacred principle of constitutional liberty. The inevitable result of such a course, as is fully borne out by the world's history, is ultimate disintegration and destruction of the Government."

In Boyd *v.* United States, 116 U. S. 616, 635, Mr. Justice Bradley, speaking of the invasion of the constitutional rights in that case, said: "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property shall be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen and against any stealthy encroachments thereon."

Nor can it be successfully contended in this case that because the entry into the defendant's house was made by means of a lawful warrant, the seizure of the liquor illegally in his possession was no violation of his constitutional right. The seizure was just as much a violation without a warrant describing the property as the entry would have been without such warrant.

Recurring again to the case of Boyd *v.* United States, 116 U. S. 616, Mr. Justice Bradley used this language, page 630, which has been quoted approvingly many times since: "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence, but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence."

So we conclude, in the light of all the authorities, that the seizure of the liquor in question without a search warrant therefor was a violation of the fundamental constitutional rights of the defendant.

2. But there is still another important question to consider: Will the courts stop to inquire, in the midst of a criminal trial, whether the evidence, otherwise competent, has been legally obtained? Upon this question there is a very sharp difference of opinion. One class of cases holds that where evidence has been obtained by the violation of a constitutional guarantee, the courts ought not to justify such illegal procedure in attempting to enforce the laws. Another class holds that while the evidence may have been unconstitutionally obtained, courts, in the administration of the criminal law, are not accustomed to be over-sensitive in regard to the sources from which the evidence comes.

It seems that the United States courts, while recognizing the rule as to evidence and procedure above referred to, tend strongly to preserve the constitutional safeguards: Gouled *v.* United States, 255 U. S. 298; Weeks *v.* United States, 232 U. S. 383; Adams *v.* New York, 192 U. S. 585; Boyd *v.* United States, 116 U. S. 616; United States *v.* Rykowski, 267 Fed. Repr. 866; Youngblood *v.* United States, 266 Fed. Repr. 795; United States *v.* Bush, 269 Fed. Repr. 455; United States *v.* Kraus, 270 Fed. Repr. 578; United States *v.* Slusser, 270 Fed. Repr. 818; United States *v.* Porazzo Bros., 272 Fed. Repr. 276; United States *v.* Kelih, 272 Fed. Repr. 484; United States *v.* O'Dowd, 273 Fed. Repr. 600; United States *v.* Burnside, 273 Fed. Repr. 603; United States *v.* Lydecker, 275 Fed. Repr. 976.

Some of the state courts, in no uncertain terms, follow the rule of the Federal courts and hold that the evidence obtained without a search warrant, or upon an illegal search warrant, is inadmissible: Hughes *v.* State, 238 S. W. Repr. 588; Hammock *v.* State (Ga.), 58 S. E. Repr. 66; Rusher *v.* State, 94 Ga. 363, 21 S. E. Repr. 593; People *v.* Margelis (Mich.), 186 N. W. Repr. 488; People *v.* De La Mater (Mich.), 182 N. W. Repr. 57; People *v.* Mayhew (Mich.), 182 N. W. Repr. 676; State *v.* Gibbons (Wash.), 203 Pac. Repr. 390; State *v.* Sheridan (Iowa), 96 N. W. Repr. 730; Blacksburg *v.* Beam (So. Car.), 88 S. E. Repr. 441, L. R. A. (1916 E.), 714; Youman *v.* Com., 189 Ky. 152, 224 S. W. Repr. 860; Atz *v.* Andrews (Fla.), decided June 30, 1922, not yet reported.

In the last cited case, the court, after referring to a number of cases, said:

"From these the inference may be drawn that constitutional guarantees are more carefully guarded and protected in the Federal than in the state courts.

"If such a distinction exists, it may account for the growing tendency to broaden and extend the Federal power.

"Whatever other state courts may do, the Supreme Court of Florida will guard and protect the constitutional rights, privileges and immunities of the people as sacredly as the Federal courts.

"Why a court should encourage its officers *illegally to acquire* evidence to be used against a person on trial for having *illegally* acquired some commodity is a problem in morals that is a bit confusing to one not a zealot or a fanatic.

"For one to acquire illegally or illegally to possess intoxicating liquors is a crime, but it is a crime that generally affects a few persons in a restricted locality. To permit an officer of the state *to acquire evidence illegally* and in *violation of sacred constitutional* guarantees, and to use the *illegally acquired* evidence in the prosecution of the person who illegally acquired the intoxicants, strikes at the very foundation of the administration of justice, and where such practices prevail makes law enforcement a mockery.

"In this era, when earnest thinking men and women are ardently trying to arouse public sentiment on the subject of strict law enforcement, it would seem most meet and proper for the courts to set the example and not sanction law-breaking and constitutional violation in order to obtain testimony against another law-breaker. Better the mob and the Ku-Klux than a conviction obtained in a temple of justice by testimony illegally acquired by agents of the Government and officers of the law."

In Rusher *v.* State, 94 Ga. 363, that great jurist, Chief Justice Bleckely, said: "The law ought to hold out no encouragement to violent and lawless men to commit crime for the sake of detecting a previous crime and bringing the offender to punishment. The law should never suffer itself to become an enemy or antagonist to its own reign. Multiplication of crimes as a remedy

2 D. & C.

for crime would be a very absurd and disastrous public policy, and we think courts should not lend themselves to the advancement of any such policy, unless they are compelled to do so by statute or some authority equally obligatory."

In Hughes v. State, 238 S. W. Repr. 588, the court said (page 594) : "The state, having, through its executive representatives, produced the evidence of a violation of the law by one of its citizens by means prohibited by the Constitution, cannot be permitted, through its judicial tribunal, to utilize the wrong thus committed against the citizen to punish the citizen for his wrong; for it was only by violating his constitutionally protected rights that his wrong has been discovered. It is no answer to say that it matters not how a citizen's sins have been found out. Security from unlawful search is the right guaranteed to the citizen, even for the discovery of the citizen's sins. This right we must protect, unless we may with impunity disregard our oath to support and enforce the Constitution."

Notwithstanding these vigorous exceptions in the later cases, the majority of the state courts have followed the leading case of Com. v. Dana, 2 Met. (Mass.) 329, decided in 1841, in which it is said that the court can take no notice as to how the evidence was obtained, whether lawfully or unlawfully, nor will they form a collateral issue to determine that question: State v. Pomeroy (Mo.), 32 S. W. Repr. 1002; State v. Royce (Wash.), 80 Pac. Repr. 268; Gindrat v. People, 138 Ill. 103, 27 N. E. Repr. 1085; State v. O'Connor (Kan.), 43 Pac. Repr. 859; State v. Griswold (Conn.), 34 Atl. Repr. 1046; Starchman v. State (Ark.), 36 S. W. Repr. 940; People v. Wicka, 192 New York Supp. 633; Com. v. Brelsford, 161 Mass. 61; Com. v. Tibbetts, 157 Mass. '519; Com. v. Hurley, 158 Mass. 159. To these citations many others might be added.

In some of the cases a distinction is made between the seizure of papers which are not the basis of the charge, but merely of an evidential character, and seizure of property kept for an illegal use: State v. Krinski (Vt.), 62 Atl. Repr. 37. In some the distinction is made between evidence illegally obtained and that obtained by the unlawful conduct of police officers: Hughes v. State, 238 S. W. Repr. 588, 590; Cohn v. State (Tenn.), 109 S. W. Repr. 1149; Imboden v. People (Col.), 90 Pac. Repr. 608. In some a further distinction is made between lawful and unlawful property: State v. O'Connor, 43 Pac. Repr. 859.

It is also held that where the evidence is obtained by private individuals or by state officers, where the jurisdiction is in the United States court, the constitutional guarantee does not apply. It only applies against the governmental agency which is prosecuting: United States v. O'Dowd, 273 Fed. Repr. 600; United States v. Burnside, 273 Fed. Repr. 603. In all of these cases the provision against unreasonable search and seizure, and the provision protecting an accused against being compelled to give evidence against himself, have been coupled and treated together. In some cases, however, it is held that where the thing seized is offered in evidence, it is not the defendant who gives the evidence against himself, and, therefore, that constitutional guarantee does not apply: State v. Flynn, 36 N. H. 64; Shields v. State (Ala.), 16 So. Repr. 85.

In our own state it has also been held that the "court will not suspend the conduct of a trial to enter into a collateral inquiry as to the means through which the evidence, otherwise competent, was obtained:" Com. v. Vigliotti, 75 Pa. Superior Ct. 366, 378; Com. v. Shultz, 1 D. & C. 742.

The case of Com. v. Vigliotti was affirmed by the Supreme Court of Penn-

sylvania, 271 Pa. 10, and by the United States court, April 10, 1922 (U. S. Supreme Court, Adv. Op., 1921-1922, 389); but this question does not seem to have been considered in the Supreme Court of Pennsylvania or the Supreme Court of the United States. In that case the defendants were arrested by an officer who had a warrant for the arrest, and who took a considerable quantity of liquor from the premises where the defendants were found. The liquor was offered in evidence. It was objected to on the ground that the possession of the exhibit was obtained in violation of the constitutional provisions under consideration.

But it is urged that the decision of the Superior Court was rendered before the decision in Gouled *v.* United States, 255 U. S. 298.

In this case Mr. Justice Clarke said (page 312): "It is plain that the trial court acted upon the rule, widely adopted, that courts in criminal trials will not pause to determine how the possession of evidence tendered has been obtained. While this is a rule of great practical importance, yet, after all, it is only a rule of procedure, and, therefore, it is not to be applied as a hard and fast formula to every case, regardless of its special circumstances. We think, rather, that it is a rule to be used to secure the ends of justice under the circumstances presented by each case, and where in the progress of a trial it becomes probable that there has been an unconstitutional seizure of papers, it is the duty of the trial court to entertain an objection to their admission or a motion for their exclusion and to consider and decide the question as then presented, even where a motion to return the papers may have been denied before trial. A rule of practice must not be allowed for any technical reason to prevail over a constitutional right."

In the case just quoted the defendant did not know of the possession of the papers until the trial, and the court held that the objection was not too late, because the rule that such objection will not be entertained unless made before trial was obviously inapplicable.

It is difficult to reconcile the positive language of the Supreme Court of the United States with the equally positive language of the Superior Court of Pennsylvania in the case of Com. *v.* Vigliotti, 75 Pa. Superior Ct. 366, to the effect that "the court will not suspend the conduct of a trial and enter into a collateral inquiry as to the means through which the evidence, otherwise competent, was obtained." This rule has been recognized in Boyd *v.* United States, 116 U. S. 616; Weeks *v.* United States, 232 U. S. 383; Adams *v.* New York, 192 U. S. 585. It has also been held that where application is made for the return of the property illegally seized before trial, the court should order such return and not permit the prosecuting authorities to retain it for use at the trial: People *v.* Marxhausen (Mich.), 171 N. W. Repr. 557, 3 A. L. R. 1505; State *v.* Peterson (Wyoming), 194 Pac. Repr. 342, 13 A. L. R. 1284; Burdeau *v.* McDowell, 256 U. S. 465.

The defendant in the case before us knew in advance of the trial of the seizure which he claims was illegal, but made no move to protect his constitutional right by an application for the return of the property, and while we agree that a rule of practice must not be allowed to prevail over a constitutional right, as stated in Gouled *v.* United States, 255 U. S. 298, yet we are bound by the positive language of our Superior Court. We are considering the provisions of the Constitution of Pennsylvania. As heretofore pointed out, the Federal Constitution in this respect relates only to Federal agencies. Therefore, no Federal question is here involved, and the decisions of the Federal courts are only advisory, while those of the appellate courts of Pennsylvania are binding.

2 D. & C.

Commonwealth *v.* Eitler.

We, therefore, conclude that the seizure of this liquor was illegal, and if application had been made the property would have probably been returned to the defendant; but, inasmuch as no objection to the possession of the property by the prosecuting officials was made until the trial, it was not error, under all the circumstances, to admit the evidence.

The motion for a new trial is, therefore, overruled and the district attorney directed to move for judgment.

From William Jenkins Wilcox, Harrisburg, Pa.