Burke, J. (dissenting).
Inasmuch as the majority have completely brushed aside a clearly defined, reasonable legislative standard of decency with respect to nudity, for reasons of their own, and inasmuch as some have declared that this State’s licensing system for motion pictures is unconstitutional if applied to deny a license to a motion picture on any ground other than obscenity, without the slightest shred of specific authority, but merely on the basis of conjecture, we are compelled to dissent. We believe that their decision virtually strips the Legislature of power entrusted to it by the People of the State of New York.
The picture was filmed at a lake front nudist park in another State. The motion picture depicts in color the life in a nudist camp with views of nude men, women and children singly, in pairs and in groups, walking, talking, swimming and playing together. The numerous male and female adults and children in the picture are totally exposed to one another so that they are concededly exposing their private parts in each other’s presence. Views of the adults ’ private parts are not shown to the audience, but the genitalia of children and girls and the buttocks and breasts of men and women are revealed to the audience. In addition the picture contains specific protracted scenes of women in unwholesome, sexually alluring postures which are completely unnecessary to — and in fact a radical departure from — the activities of the nudist camp depicted. For example, there is a dream sequence in which the principal actress, a comely young lady, completely disrobes in full view of the audience in a manner not unlike that generally utilized by professional ecdysiasts.
Other scenes of like tenor, not honestly relevant to the innocent propagandizing of nudism as a way to mental and physical well-being, are present. By no stretch of the imagination can *249 it be equated to the educational studies of aboriginal tribes found in museums, and respectable travel films or magazines.
The film was examined by a reviewer and the acting director of the Motion Picture Division of the State Education Department. After the denial of the license, the petitioner requested the Board of Regents to review the decision of the Motion Picture Division. The film was re-examined by a committee of the members of the Regents. Thereafter the Committee report, signed by two prominent members of the Bar of this State, affirmed the denial of the license on the ground that a pubilc display of the picture in the amusement theatres of the State before mixed audiences of all ages would be “ indecent ”. The determinations of the Motion Picture Division and the committee were thereafter unanimously approved by the 13 Regents.
The petitioner instituted this article 78 proceeding to annul the determination. It contends that the picture is not ‘ ‘ indecent ’ ’ within the meaning of section 122 of the Education Law, and, further, that the word ‘ ‘ indecent ’ ’ in section 122 of the Education Law is vague, indefinite and that, therefore, the section is void to that extent for failing to conform to the requirement of due process of law prescribed by the Fourteenth Amendment of the Constitution of the United States. Finally, Excelsior claims that the statute imposes an unconstitutional restraint upon freedom of speech because no system of censorship which requires prior approval of motion pictures would be reconcilable with the language and purpose of the First Amendment of the Constitution of the United States.
The contention that the film is not “indecent” within the intendment of section 122 of the Education Law is without merit. Section 1140-b of the Penal Law provides: “A person who in any place wilfully exposes his private parts in the presence of two or more persons of the opposite sex whose private parts are similarly exposed, or who aids or abets any such act, or who procures another so to expose his private parts or who as owner, manager, lessee, director, promoter or agent, or in any other capacity, hires, leases or permits the land, building or premises of which he is the owner, lessee or tenant, or over which he has control, to be used for any such purposes, is guilty of a misdemeanor. ’ ’
The history of this legislation makes it crystal clear that the exhibition of male and female nudes totally exposed to each *250 other offends the community sense of decency. Shortly prior to the enactment of section 1140-b of the Penal Law, there were various sections extant which labelled certain acts as “indecent ” such as exposure of person, outraging decency, etc. (see Penal Law, §§ 1140, 43, 1530, 1533). In the spring of 1934, one Burke, who was a director of the Olympian League, an organization devoted to the principles of nudism, arranged a gymnasium meeting of the league members by letter in furtherance of ‘ ‘ Nudism Forward ’ ’ month. Admission was permitted upon presentation of the same letter signed by Burke and a fee of $1. Some 10 men and 4 women took part in swimming and exercises in the nude. Burke was subsequently convicted in the Court of Special Sessions of violating sections 43, 1140 and 1530 of the Penal Law. In December, the Appellate Division, with one Justice dissenting, reversed the conviction for the stated reason that the law ‘1 at present ’ ’ was not 11 sufficiently broad enough to render a conviction ” (People v. Burke, 243 App. Div. 83, 84). On January 7,1935, legislation was introduced to add section 1140-b to the Penal Law. While this legislation was pending, this court, in April, 1935, with two Judges dissenting, affirmed the Appellate Division (267 N. Y. 571). The legislation was passed by the Legislature and became the law on May 11, 1935 (L. 1935, ch. 868). There can be no doubt that the legislation was designed to deal with this type of nudist cult practices (see People v. Burke, 243 App. Div. 83, State Reporter’s footnote; Albany Times Union, April 1, 1935, p. 13, col. 4 ;New York Times, April 2,1935, p. 4, col. 4, April 9, 1935, p. 12, col. 7; Governor’s Bill Jacket on L. 1935, ch. 868).
It is likewise apparent that the legislation was specifically enacted to overcome the decision of this court and the Appellate Division in the Burhe case [supra) and to declare the opinion of the dissenters to be the public policy of this State. Resort to precedents not even remotely relevant will not suffice. People v. Eastman (188 N. Y. 478) falls in that category. They are factually and legally inapposite. People v. Eastman (supra) was merely a forerunner of People v. Burke (supra) now no longer an authority in respect to the illegal conduct described in section 1140-b of the Penal Law and indulged in by the nudists in this picture. The words of this statute should not be twisted out of their meaning. The court must regard the plain meaning of the statute with respect. Public policy may not be shaped *251 out of a play on words or governed by personal impressions or attitudes. To substitute the bare conclusions of a few Judges in place of the determination of the Legislature and to challenge the wisdom of the Legislature constitutes a usurpation of the powers of the Legislature and a veto of the declaration of public opinion arrived at after debate.
We recently said in Matter of New York, Post Corp. v. Leibowitz (2 N Y 2d 677, 685-686) “ In construing statutory provisions, the spirit and purpose of the statute and the objectives sought to be accomplished by the legislature must be borne in mind. ‘ The legislative intent is the great and controlling principle. Literal meanings of words are not to be adhered to or suffered to “ defeat the general purpose and manifest policy intended to be promoted (People v. Ryan, 274 N. Y. 149, 152; see, also, Matter of United Press Assns. v. Valente, supra, 308 N. Y. 71, 83-84 * * * ) ”. Here we need not have recourse to general definition to establish that the conduct engaged in by the nudists in “ Garden of Eden ” is indecent within the meaning of section 122 of the Education Law. Section 1140-b of the Penal Law clearly evidences the legislative intent.
In light of the history of the legislation it was quite proper for the Regents to apply the standards set by this section of the Penal Law for the purpose of determining the character of nudity which is indecent under section 122 of the Education Law. It would be unreasonable to assume that the Legislature intended to authorize the viewing of such acts on motion picture screens, while it condemned the conduct in camps or gymnasiums. The exhibition of “Garden of Eden ” would be a “ professional exploitation of nudism for profit ” and a “ widespread use of exhibitionism for financial gain ” in violation of the purposes of the statute (Public Papers of Governor Herbert H. Lehman, 1935, p. 352). Therefore, a license for general exhibition of the picture would violate a standard of decency specifically defined by the Legislature in respect to nudity, and flaunt the public policy established by the Legislature.
That the conduct of the people depicted by the scenes of this film falls within that defined by section 1140-b of the Penal Law in that the minimum required number of male and female nudes are totally exposed to one another cannot be denied. It is conceded. However, respondent relies on the absence of any *252 scene showing the genitalia of the adults to the audience. This contention is without merit. The test set by the provisions of section 1140-b has no such requirement. It simply requires that the nudists be engaged in the activity of exposing their private parts to those of the opposite sex whose private parts are similarly exposed. With this in mind there can be no doubt that this picture is indecent within the meaning of section 122.
While some individuals may disagree with the wisdom of such a standard, we must uphold it. Irrespective of personal views, we, in construing these statutes, may not substitute our judgment—or the judgment of others, however much revered or respected-—for the judgment of the Legislature which is the representative of the People of the State of New York and reflects their opinions. The forum for debate as to the desirability of such legislation has been provided for under our form of government and our laws. It is the Legislature, not the courts. Appellate judges should not constitute themselves a ‘ ‘ tiny autonomous Legislature ’ ’ in order to thwart and frustrate the public opinion of the People of the State. An oligarchy cannot be substituted in place of our democracy by judicial fiat. There is nothing in our system of laws which prevents the amendment or change of the law if the People of the State of New York so desire (see Daniel v. Family Ins. Co., 336 U. S. 220, 224). The Legislature has described the type of conduct of nudists which is prohibited by a specific statute so that there can be no question in the mind of a judge, a citizen, or the Board of Regents as to the meaning of the statute. As the court stated in United States v. Harmon (45 F. 414, 417, 422): “Laws of this character are made for society in the aggregate, and not in particular. So, while there may be individuals and societies of men and women of peculiar notions or idiosyncrasies, whole moral sense would neither be depraved nor offended by the publication now under consideration, yet the exceptional sensibility, or want of sensibility, of such cannot be allowed as a standard by which its obscenity or indecency is to be tested. Rather is the test, what is the judgment of the aggregate sense of the community reached by it? * * * In short, the proposition is that a man can do no public wrong who believes that what he does is for the ultimate public good. The underlying vice of all this character of argument is that *253 it leaves out of view the existence of the social compact, and the idea of government by law.”
It is obvious that insofar as nudity is concerned, the term “indecent” of section 122 of the Education Law, as confined and limited by the standards set forth in section 1140-b of the Penal Law, is so clear and certain that it does not offend due process. When so defined, indecency is not a chameleon term, lacking in calculable content. It speaks not of abstractions, but of objective standards, and its scope is of mathematical precision. Under this construction there is no fear that a decision by an administrative agency is left to arbitrary judgment (cf. Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495). Nor is there any doubt that this construction sufficiently apprises one bent on obedience of law of what is to be regulated (Beauharnais v. Illinois, 343 U. S. 250; Connally v. General Constr. Co., 269 U. S. 385). As thus construed and applied in this situation, there can be no valid objection on the ground that the term “ indecency ” is so vague that it is violative of due process.
It well may be that for the purpose of applying this statute to other circumstances the Legislature should amend it to include a broad comprehensive definition, as it amended the statute to further define and limit the term ‘ ‘ immoral ’ ’ after the Supreme Court of the United States reversed this court’s holding in Matter of Commercial Pictures Corp. v. Board of Regents (305 N. Y. 336). (See Commercial Pictures Corp. v. Regents, 346 U. S. 587; L. 1954, ch. 620.) However, that is no concern of ours at the present time, and we need not deal with questions so abstract to determine this controversy (Ashwander v. Tennessee Val. Auth., 297 U. S. 288, 341, 346-348). State action cannot be found hypothetically unconstitutional (Hatch v. Reardon, 204 U. S. 152). As here construed, the statute only applies to public or quasi-public places. Irrelevant references to family members unclothed within the family home miss the mark. Under very familiar law, the construction placed upon the statute by this court fixes its meaning for this case (Winters v. New York, 333 U. S. 507, 514; Beauharnais v. Illinois, supra, p. 253; Hebert v. Louisiana, 272 U. S. 312, 317).
Equally without substance is the claim that the requirement of prior approval of motion pictures in and of itself offends the letter and spirit of the First Amendment to the Constitution. *254 1 ‘ The phrase 1 prior restraint ’ is not a self-wielding sword. Nor can it serve as "a talismanic test.” (Kingsley Books v. Brown, 354 U. S. 436, 441.)
The decisions of the Supreme Court of the United States have not condemned licensing of films in advance of exhibition as a contravention of the First Amendment. In each case that court has merely held that the standard used was not sufficiently definite and certain to satisfy the minimum requirements of due process (see, e.g., Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495, supra [“ sacrilegious ” vague]; Superior Films v. Department of Educ., 346 U. S. 587 [“ harmful ” too indefinite]; Matter of Commercial Pictures Corp. v. Board of Regents, 305 N. Y. 336, revd. sub nom. Superior Films v. Department of Educ., 346 U. S. 587 [“immoral” indefinite]). In the Burstyn case (supra) the Supreme Court reiterated the caveat set forth in Near v. Minnesota (283 U. S. 697): “To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. That much is evident from the series of decisions of this Court with respect to other media of communication of ideas ” (pp. 502-503). That much this court recently declared (see Brown v. Kingsley Books, 1 N Y 2d 177, 184). Furthermore, as the Legislature is not constitutionally limited in its choice of remedial processes in dealing with proscribed conduct, we fail to see why the statutory procedure followed here should be declared unconstitutional simply because we are dealing with a motion picture (see Kingsley Books v. Brown, 354 U. S. 436, supra). In the absence of any definitive authority, we should not indulge in the assumption that this State’s motion picture licensing system is unconstitutional when applied to deny a license to a motion picture on any ground other than obscenity. Particularly is this true where to do so would be to deprive the State of a valuable weapon for combating conduct detrimental to its well-being. Nor do we find persuasive the reasoning that we may longer preserve this licensing system by judicially nullifying its operation and effects. To preserve its form while denying its substance would be to gain nothing.
Insofar as any question of prior restraint is concerned, it is interesting to observe that the objectives, procedures and stand *255 ards established by section 22-a of the Code of Criminal Procedure, which was recently upheld as constitutional in the Kingsley case (supra) are similar to and parallel sections 120-132 of the Education Law when we consider them against the facts and procedure involved in this case.
The license was not denied without thorough consideration. The picture was reviewed by a reviewer, by the acting director of the Motion Picture Division, and by a committee of three members of the Board of Regents consisting of two prominent members of the New York Bar, and the present chairman of the board. Thereafter the determination of all the reviewers was approved by a unanimous vote of the Board of Regents. The finding was the same as it would be if the defendant had been arraigned under the provisions of section 1140-b of the Penal Law. Since the petitioner admitted the acts in the picture Avere the acts of totally nude persons in a nudist camp, there was no need of proving the fact beyond a reasonable doubt. The usual procedural safeguards of judicial proceedings were complied with. The petitioner has had two appellate reAdews. Surely no one can challenge the competency of the prominent and experienced citizens comprising the Board of Regents or, for that matter, the trained reviewer and acting director of the Motion Picture Division. This is not a case involving the sole judgment of a police commissioner or a local official subject to local prejudice. The motion picture is the eAddence. It speaks for itself. It cannot be cross-examined. It was reviewed carefully and thoroughly.
Under such circumstances, the statute in question, as construed, is operative in this case. The motion picture “ Garden of Eden ” is a class of speech, the prevention of which does not raise any constitutional problem. Petitioner would convert an issue of law enforcement policy into a spurious contest over constitutional rights, but it ignores the fundamental doctrine that the State has inherent police power to prevent a shoAving of a film Avhich it classifies as indecent by a specific statute, because it displays persons admittedly and pridefully exposing their private parts to those of the opposite sex whose private parts are similarly exposed. The police power extends to and includes “ everything essential to the public safety, health and morals ” (Lawton v. Steele, 152 U. S. 133, 136; see Berman v. Parker, 348 U. S. 26, 32, 33). “ The police power does not *256 have its genesis in a.written constitution. It is an indispensable attribute of our society, possessed by the state sovereignties before the adoption of the Federal Constitution, Mayor, &c., of the City of New York v. Miln, 11 Pet. 102, 9 L. Ed. 648 (1837) ”. (Schmidt v. Board of Adjustment of City of Newark, 9 N. J. 405, 414.) A commentator on personal freedom, John Stuart Mill, in his essay “On Liberty ”, says: “Again, there are many acts which, being directly injurious only to the agents themselves, ought not to be legally interdicted, but which, if done publicly, are a violation of good manners, and coming thus within the category of offences against others, may rightfully be prohibited. Of this kind are offences against decency; on which it is unnecessary to dwell, the rather as they are only connected indirectly with our subject, the objection to publicity being equally strong in the case of many actions not in themselves condemnable, nor supposed to be so.”
Moreover, variant mediums of expression are not subject to universal rules. Taking into consideration the time, place and mode of expression, limitations upon the individual’s right of free speech •—• including prior restraint — when imposed by a State is not necessarily unconstitutional (cf. Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572). Where particular means of expression are involved, there are areas where the State may previously restrain the exercise of free speech and it will merely be considered as a reasonable accommodation between the individual’s right and a conflicting interest which a State is entitled to,make under the circumstances (see Cox v. New Hampshire, 312 U. S. 569). The unrestricted invalidation of statutes or ordinances upon constitutional grounds, and without any examination of their reasonableness, could eventually endanger the right of free speech itself by making it ridiculous and obnoxious. For example, the Supreme Court has recognized that the use of audio amplification devices, even when used for the purpose of making utterances on religious subjects, may be previously restrained by a police commissioner under a licensing statute where the statute is so narrowly drawn as to regulate the hours or places of use, or the decibel volume to which they may be adjusted, so that the grant of the license would not rest upon any arbitrary decision of the police commissioner (see Saia v. New York, 334 U. S, 558, 560, 562). Similarly it has recognized that motion *257 pictures are not necessarily subject to the precise rules which govern other methods of expression (see Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495, 503, supra).
In view of this we think that as construed the statute in question is a reasonable regulation upon motion pictures as medium of expression. It does not previously restrain speech with respect to nudism — in fact, there is no objection to any of the dialogue. It does not even make illicit or restrict the portrayal of nude people or nudist camps per se. It merely prevents the showing of nudists of opposite sexes exhibiting their privates to each other. It is the viewing of this specific form of nude exhibitionism which the Legislature found harmful and necessary to regulate. “ To say that representation of criminal activity is criminal is to abolish the drama and the novel in one stroke ” is to sound a false alarm and to incite unrealistic fears. When the final curtain is rung down the murdered Caesars and Desdemonas step before it, take their bows and receive their plaudits. No penal statute pertaining to crimes against person, property or habitation have been contravened. But when we turn to specific forms of nude conduct, the situation is otherwise. Aside from the question of degree, the resulting harm is the same whether the exhibition is in person or portrayed. In fact, by portrayal it may even be heightened. • With the present advances of the art of motion picture photography, this is true with that medium. The exhibition of the actions of the nudists in the ‘ ‘ Garden of Eden ’ ’ is actually more life-like than their presence upon the stage. As it is constitutionally within the police power to regulate the actual presence of a nudist camp upon a public stage within this State, we fail to see how it would not be constitutionally within the police power to regulate a more alluring portrayal of those actions upon the screen particularly under such a narrowly construed statute. Civil liberties are not unrestricted rights which may at all times and under all circumstances be exercised in spite of the reasonable restrictions of the society upon which they depend for the protection of their free existence. As Chief Justice Hughes, writing for a unanimous Supreme Court, declared: ‘ ‘ Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses.” (Cox v. New Hampshire, 312 U. S. 569, 574, supra.)
*258 The order of the Appellate Division annulling the determination of respondents-appellants and directing the licensing of the film should be reversed and the petition dismissed.