THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* VINCENT BURKE and Others, Appellants.*

First Department, December 24, 1934.

* Affd., 267 N. Y. —.

*Ilo Orleans* of counsel [*Samuel Falk* and *Lee Hazen* with him on the brief; *Falk & Orleans*, attorneys for Fred Topel; *Lee Hazen*, attorney for Vincent Burke and Frank Maniscalco], for the appellants.

*Philip A. Donahue, Deputy Assistant District Attorney*, of counsel [*William Copeland Dodge, District Attorney*], for the respondent.

PER CURIAM. An information was filed in New York county accusing the defendants, in four counts, of the violation of section 1140 of the Penal Law (indecent exposure), section 43 (openly outraging public decency), section 1530, subdivision 2 (maintaining public nuisance), and section 1533 (permitting building to be used for public nuisance).

Defendants Burke and Topel, on June 11, 1934, were found guilty by a Court of Special Sessions, one judge dissenting. Defendant Maniscalco, on June 18, 1934, stipulated with the district attorney that the record of the previous trial should be used as an agreed statement of facts, and would be deemed the entire testimony in his case. He also was found guilty on the record, one judge dissenting. Maniscalco and Topel received suspended sentences. Burke was fined the sum of fifty dollars with the alternative of spending ten days in prison. The three defendants have joined in this appeal. In dissenting, Mr. Justice KERNOCHAN said: " I don't feel that the law at present, enacted a number of years ago, is sufficiently broad enough to render a conviction on this evidence. It is possible, should the Legislature see fit to stop this practice,— I think it should be dealt with at the next opportunity to pass laws in that regard."

On the final analysis, the crimes charged in the different counts are based primarily on an alleged violation of section 1140 of the Penal Law. In the light of the testimony adduced in this particular case, we believe that the conclusion reached by the dissenting justice of the Court of Special Sessions was based upon a solid foundation and the judgment entered should be reversed, the information dismissed, and the fine remitted.

Present — FINCH, P. J., MERRELL, TOWNLEY, GLENNON and UNTERMYER, JJ.; MERRELL, J., dissents and votes for affirmance.

MERRELL, J. (dissenting). The various provisions of the Penal Law for a violation of which the defendants were convicted provide as follows:

" § 1140. Exposure of person. A person who wilfully and lewdly exposes his person, or the private parts thereof, in any public place, *or in any place where others are present*, or procures another so to expose himself, is guilty of a misdemeanor." (Italics are the writer's.)

" § 1530. Public nuisance defined. A 'public nuisance' is a crime against the order and economy of the state, and consists in unlawfully doing an act, or omitting to perform a duty, which act or omission: * * *

" 2. Offends public decency."

" § 1533. Permitting use of building for nuisance; * * *

" A person who:

" 1. Lets, or permits to be used, a building, or portion of a building, knowing that it is intended to be used for committing or maintaining a public nuisance * * *

" Is guilty of a misdemeanor."

" § 43. Penalty for acts for which no punishment is expressly prescribed.

" A person who wilfully and wrongfully commits any act which * * * openly outrages public decency, for which no other punishment is expressly prescribed by this chapter, is guilty of a misdemeanor."

The alleged acts of violation of the statute occurred in a gymnasium in the basement of the Riverside Theatre Building, 2561 Broadway in the city of New York. The gymnasium was owned by one Morris Topel, and was managed by a brother of said Morris Topel, the defendant Fred Topel. Early in February, 1934, Fred Topel entered into an agreement with the defendant Burke, who was a director of an organization known as Olympian League, devoted to the furtherance of the so-called principles of nudism. Under such agreement, the league was to have the use of the gymnasium on Tuesday and Thursday nights at a rental of five dollars for Tuesday nights and seven dollars for Thursday nights. Under such agreement the Olympian League used the gymnasium for its purposes. The defendant Topel furnished the mats and other paraphernalia. The defendant Burke attended the meetings and collected the entrance fee of one dollar from each participant. The defendant Maniscalco conducted the classes as an instructor.

On March 27, 1934, Burke, as director of the Olympian League, sent out the following letter inviting those to whom it was addressed and their friends to attend an important meeting of the league to be held at Topel's on April 3, 1934:

" 1 SAMSONDALE AVENUE,
WEST HAVERSTRAW, N. Y.
*March* 27, 1934.

" DEAR FRIEND: On the evening of Tuesday, April 3rd, the Olympian League will conduct its annual Nudism Forward Campaign, at its regular Tuesday evening meeting, which you are

cordially invited to attend. Since opposition to the nudist movement has recently begun to show itself in certain quarters, it is more important than ever that we all make the strongest demonstration possible by turning out in large numbers for the opening of ' Nudism Forward ' month.

" Those veteran Olympians who turned out last December 8th, for our fifth anniversary, will be sure to attend, we know, when we tell them this will be the most important meeting of Olympians held to date, and this does not exclude the First American Nudist Convention, which was held under Olympian League auspices at Highland in 1932.

" The usual Tuesday evening program will be followed. There will be gymnastics, games, basketball, indoor baseball, baseball, medicine ball games and the swimming pool activities.

" In addition to providing an opportunity for a seasonable get-together for the veterans, this meeting will also provide an excellent opportunity for those who have not practiced nudism with an organized group, and there will be a large number of new nudists participating for the first time at this meeting.

" All Olympians who have friends who are interested in the movement are urged to bring them to the gymnasium on April 3rd. The admission fee for non-members of the present Olympian League, will be $1 for single men or single or married couples. These Tuesday meetings will be continued each week during ' Nudism Forward ' month.

" Remember the date — April 3rd — the place — Topel's Swimming School in the Riverside Theatre Building, 96th Street and Broadway, New York City — the time 8–10:15 P. M.— the occasion, the opening gun in our ' Nudism Forward Campaign.'

" Hoping to see you at Topel's, I am,

" Cordially yours,

" THE OLYMPIAN LEAGUE

" Vincent Burke, *Director*."

It will be seen from the above-quoted letter sent out by the Olympian League that the invitation to the public was quite general. Any one was welcome to the meeting who would pay the required entrance fee. The defendant Burke, sitting at a desk at the entrance, received the admission fees of those desiring to attend the meeting. To all intents and purposes the meeting was conducted like any other theatrical performance. The meeting was, in no sense, a private one, but was open to the public, any one who paid the admission fee exacted being permitted to attend. One of Burke's letters came into the possession of Police

Officer Louis Barr, it having been handed to him by the police inspector of his division, who instructed Barr to attend the meeting. Accompanied by Policewoman Brady, Barr went to the gymnasium on the night of April third, arriving there at about eight-forty-five in the evening. He found the defendant Burke seated at a desk in the front of the premises. Barr inquired as to whether classes were to be held and what the fee was for himself and his companion. He was told that classes were to be held, and that the fee would be one dollar for both. This sum Barr paid to Burke, and also gave him the letter, it being one of those Burke had sent out. Barr and his female companion entered the gymnasium and saw some ten men without any clothing whatever playing handball and others tossing a medicine ball. Four women entered the dressing room and removed their clothes and appeared on the gymnasium floor in the nude. Defendant Maniscalco then announced that the class was to form for exercises. An old gentleman on the floor introduced himself to Barr and Policewoman Brady and asked them why they did not take off their clothes. Both of them pleaded bashfulness, and shortly thereafter the defendant Topel approached and asked the same question, assuring them that it was "like taking your first plunge. Once you are in, there is nothing to it." However, upon still pleading reluctance to remove their clothing, Barr asked permission to watch the proceedings from the sidelines. Such permission was granted, and a chair was procured for Policewoman Brady. The class having formed, the defendant Maniscalco gave instructions in the various forms of exercises. This continued for twenty minutes, when the class was excused. Some of the pupils went to the showers, and others, both men and women, went into the pool entirely unclothed and swam about. According to the testimony of Barr and Policewoman Brady, the exercises performed were ordinary gymnasium exercises. After the exercises were over, the defendants were placed under arrest.

It seems to me there can be no question that the acts of the defendants were a direct violation, not only of the sections of the Penal Law above referred to, but of section 43 of the Penal Law, which is much broader in its scope. Section 43 of the Penal Law provides that a person who willfully or wrongfully commits any act which openly outrages public decency for which no other punishment is expressly prescribed is guilty of a misdemeanor. It is contended by the appellants that the motives of the defendants were of the highest purity, and that their intent was innocent. It is also urged that certain writers have indorsed nudism and its practices. I think these contentions are of no importance

whatever. The question presented upon this appeal is as to whether the acts of the defendants were offensive to the general sense of public decency. Beyond any question an act may offend common public decency, even though not on the part of the actor intentionally lewd, and many such acts were forbidden under the provisions of the Penal Law. The question is not how pure and sincere may have been the motives of those indulging in this practice of "nudism," but whether or not such practice, openly carried on, offends public decency. As was well said in the case of Ardery v. State (56 Ind. 328–330): "The exposure in a public place, to divers persons there assembled, by a person of his or her private parts [is] a public indecency. * * * Immediately after the fall of Adam, there seems to have sprung up in his mind an idea that there was such a thing as decency and such a thing as indecency; that there was a distinction between them; and, since that time, the ideas of decency and indecency have been instinctive in, and indeed, parts of humanity. And it historically appears that the first most palpable piece of indecency in a human being was the public exposure of his or her, as now commonly called, privates; and the first exercise of mechanical ingenuity was in the manufacture of fig-leaf aprons by Adam and Eve, by which to conceal from the public gaze of each other their now, but not then, called privates. This example of covering-their privates has been imitated by all mankind since that time, except, perhaps, by some of the lowest grades of savages."

In the recent case of People v. Ring (255 N. W. 373) the Michigan court had this to say: " Instinctive modesty, human decency, and natural self respect require that the private parts of persons be customarily kept covered in the presence of others." While a comparatively very small coterie of people seem to have adopted the so-called principles of " nudism," such " principles " have not, as yet, been accepted or adopted as desirable in this State. The great majority of people believe that, aside from any question of lewdness, common decency requires " that the private parts of persons be customarily kept covered in the presence of others." The existing provisions of the Penal Law directed against the exposure of the body and all other forms of indecency fully testify to the existing state of the public mind on the question.

I, furthermore, believe that the defendants were guilty of a violation of the provisions of section 1140 of the Penal Law. Section 1140 is to be found in article 106 of the Penal Law under the title of " indecency " and provides as follows: " A person who wilfully and lewdly exposes his person, or the private parts thereof, in any public place, or in any place where others are present, or

procures another so to expose himself, is guilty of a misdemeanor." (Italics are the writer's.) The appellants do not seriously contend but that the exposure by the nudists was willfully made. The defendants insist, however, that there was no evidence showing that the defendants *lewdly* exposed their persons or the private parts thereof. I think the defendants entirely miss the true intent of the statute. I think there is no force to their contention that if the intent of the defendants was not vicious, but clean; if the motive was not bad, but pure; if the purpose of the bodily exposure was not for lust, but in the pursuit of a wholesome ideal, that it cannot be said to have been lewd. The test which the appellants attempt to apply to the statute is purely subjective. They overlook the fact that what may have been done with pure motives and in the pursuit of a wholesome ideal, may, nevertheless, be lewd in the eyes of others. If the test of lewdness sought to be applied by the appellants was to prevail, then there is no reason why any group of individuals could not appear on the public streets wholly unclothed. If the appellants are correct that the test of lewdness depends entirely on the pure intent of those practicing it, then there is no reason why any person could not parade up and down Fifth avenue entirely nude and displaying his or her private parts, so long as he or she had no improper motive. The appellants apparently contend that one could parade the public streets of New York city entirely in the nude and, if " in the pursuit of a wholesome ideal," such act would not be lewd and there could be properly no charge made against him or her therefor. I think the test of lewdness is not subjective, but may be entirely objective. In *People* v. *Pesky* (230 App. Div. 200; affd., 254 N. Y. 373) this court wrote as follows: " The word ' lewd ' was there [ *United States* v. *Bennett*, 16 Blatchf. 338] defined as ' having a tendency to excite lustful thoughts,' and it was said that passages in a book are ' indecent within the meaning of this Act when they tend to obscenity — that is to say, matter having that form of indecency which is calculated to promote the general corruption of morals * * *. It is not a question whether it would corrupt the morals * * * of every person. * * * It is within the law if it would suggest impure and libidinous thoughts in the young and the inexperienced.'

" Judge DANIELS in *People* v. *Muller* (32 Hun, 209, at 212; affd., 96 N. Y. 408), said: ' The question in all these cases must be, what is the impression produced upon the mind by perusing or observing the writing or picture referred to in the indictment, and one person is as competent to determine that as another.' "

In *People* v. *Seltzer* (122 Misc. 329) the court said: " To summarize the general, though not exclusive, rules as aids to interpretation: The penal provision prohibits the publication of lewd, lascivious, salacious or obscene writings, the tendency of which is to excite lustful and lecherous desires; likewise it prohibits the publication of those writings whose tendency is to deprave or corrupt minds open to immoral influences and who might come in contact with it. It is also offensive to the section if the matters charged as obscene are so filthy and disgusting as to be revolting to those who may have occasion to read them."

In *United States* v. *Harmon* (45 Fed. 414, 417) the Federal court had this to say: " Laws of this character are made for society in the aggregate, and not in particular. So, while there may be individuals and societies of men and women of peculiar notions or idiosyncrasies, whose moral sense would neither be depraved nor offended by the publication now under consideration, yet the exceptional sensibility, or want of sensibility, of such cannot be allowed as a standard by which its obscenity or indecency is to be tested. Rather is the test, what is the judgment of the aggregate sense of the community reached by it? "

I think the language quoted from the foregoing decisions is directly applicable to the situation presented upon this appeal. The question is not as to the purity of the motives of the defendants, but as to what effect their acts might have upon those observing such conduct. The exposure of a body may well be lewd, although the intentions of the person exposing may be entirely innocent. The statute refers to one " who wilfully and lewdly exposes his person." That the exposure in the case at bar was willful there can be no doubt. It was done designedly. (*People* v. *Marcus*, 235 App. Div. 397, 401; affd., 261 N. Y. 268.) The question as to whether or not the exposure of one's private parts is lewd cannot depend upon the state of mind of the one exposing. If it were necessary to show a criminal intent on the part of the perpetrator, then there would be no efficiency in the statute whatever, as purity of motives could always be urged as an excuse. In other words, if the appellants are right, no person could ever be prosecuted for lewdness, unless such person intended his act to be lewd. In the Federal case of *United States* v. *Harmon* (*supra*, at pp. 421, 422) the court said: " Reduced to its actual essence, the ultimate position of defendant is this: That although the language employed in the given article may be obscene, as heretofore defined, yet as it was a necessary vehicle to convey to the popular mind the aggravation of the abuses in sexual commerce inveighed against, and the object of the publisher being to correct the evil

and thereby alleviate human condition, the author should be deemed a public benefactor, rather than a malefactor. In short, the proposition is that a man can do no public wrong who believes that what he does is for the ultimate public good. The underlying vice of all this character of argument is that it leaves out of view the existence of the social compact, and the idea of government of law. * * *

" Guiteau stoutly maintained to the end his sanity, and that he felt he had a patriotic mission to fulfill in taking off President Garfield, to the salvation of a political party. The Hindu mother cast her babe to the advouring Ganges to appease the gods. But civilized society says both are murderers. The Mormon contends that his religion teaches polygamy; and there is a school of so-called 'modern thinkers' who would abolish monogamy, and erect on the ruins the flagrant doctrine of promiscuity, under the disguise of the affinities. All these claim liberty of conscience and thought as the basis of their dogmas, and the *pro bono publico* as the strength of their claim to indulgence. The law against adultery itself would lie dormant if the libertine could get the courts to declare and the jury in obedience thereto to say that if he invaded the sanctuary of conjugal life under the belief that the improvement of the human race demanded it he was not amenable to the statute."

I think there can be no question that the exposure of the private parts of a person may violate the law without regard to the motives and intentions, and although the same may be pure and wholesome in the actor. In the case of *People ex rel. Campbell* v. *Police Commissioners* (13 App. Div. 69; appeal dismissed, 153 N. Y. 657) the relator, chief of police of Schenectady, was removed from office after a trial before a police board. The charge against the relator was that he had willfully and lewdly exposed his person. The testimony in that case was that the exposure was at the door of the water closet in his yard in the rear of the premises. It was not shown that the relator saw either of the witnesses testifying to the exposure or that he was conscious of being within their view. The removal of the relator was reversed because the court thought that the exposure was an inadvertent act and not intentional. Certainly, in the case at bar there was not inadvertence, and the exposure was intentional. So in *Miller* v. *People* (5 Barb. 203), cited in the *Campbell* case, the conviction was reversed because there was no satisfactory evidence showing that the defendants supposed they were seen by anybody, or that they intended to expose their persons to public view. In the case at bar the appellants admit that the exposure was willful. Having been willful, it was lewd as matter of course. Judging the perform-

ance which occurred at the Topel gymnasium by the effect it would have on a bystander, which the indecency statutes of our State are designed to protect, then, certainly, the exposure was lewd.

As I look at this practice of "nudism," it cannot but offend against all sense of public decency. I do not think the defendants should be permitted to shield their unlawful and indecent acts under a plea of purity of motive. So long as what they did offends public decency, it is prohibited by the statute. It cannot be doubted that the parading of persons, male and female, naked, in public places, would raise thoughts of lasciviousness and lust in many who observed such practices. I do not think this country has yet reached the stage when such practices should be permitted. The conviction of the defendants was entirely merited.

The judgment of conviction should be affirmed.

Judgment reversed, the information dismissed and the fine remitted. Settle order on notice.