PEOPLE *v.* HILDABRIDLE.

SAME *v.* WEISSENBORN.

SAME *v.* CARTER.

SEARCHES AND SEIZURES—CURTILAGE—NUDIST CAMP—WARRANT USED AS SUBTERFUGE.

Arrests made for indecent exposure upon warrants obtained as a subterfuge for gaining entrance to a nudist camp, conducted upon private property, and without any purpose of making the specific arrests, for which the warrants called, which arrests were made within the curtilage of dwellings here concerned, constituted an unreasonable search and seizure in contravention of the Constitution (Const 1908, art 2, § 10).

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted April 17, 1958. (Docket Nos. 85–88, Calendar Nos. 47,469–47,472.) Decided September 9, 1958.

In separate actions, consolidated for trial and appeal, Earl Hildabridle, Marvin Weissenborn, Harold R. Carter and Ruth Carter were convicted of indecent exposure. Reversed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Nobel O. Moore,* Prosecuting Attorney, for the people.

*Leighton & Andrews,* for defendants.

*Amicus curiae:*

American Sunbathing Association, Inc., by *Harry Gillig, Wallace B. Heider* and *Gene Lary.*

---

REFERENCES FOR POINTS IN HEADNOTES

47 Am Jur, Searches and Seizures § 53.

Dethmers, C. J. (*dissenting*). Defendants were convicted by jury in circuit court of the crime of knowingly making open and indecent exposure of their persons in violation of CLS 1956, § 750.335a (Stat Ann 1954 Rev § 28.567[1]). The court placed them on probation for 2 years, making it a condition thereof that each serve 30 days in the county jail and pay a $250 fine and $100 costs. They appeal.

Two State police officers had gone on business to "Sunshine Gardens," a nudist camp operated on private property in a secluded area. While there they had seen certain nude persons, secured their names and obtained warrants for their arrest. Thereafter, 1 of those 2 officers, in company with another officer, went to the camp with the warrants to arrest the persons therein named. While there, they saw other naked men, women, boys, and girls, out of doors, some standing, some sitting, some walking around, several in the vicinity of a pool, all exposed to the view of each other. Included were the defendants, adults, and also 4 girls then 8, 10, 11 and 12 years of age, respectively, and a 17-year-old boy, before whom the 4 defendants stood nude with private parts exposed. The officers then and there arrested defendants. Their prosecutions ensued.

We decline to take the excursion into the field of the definitions, desirability, and delights of nudism, psychiatric considerations or purportedly applicable quotations from the Scriptures suggested in the briefs, or the flights of fantasy to which the subject may beckon. Consideration will be limited to questions of law raised by appellants, of which most are scarcely novel and none deserving of extended discussion.

It is urged that there was illegal search and arrest on private property; that the statute is vague, indefinite, fails to define "open" or "indecent" exposure, is not sufficiently explicit to inform persons

as to what conduct will render them liable to its penalties, and that it is, for these reasons, repugnant to the due process clause of the 14th Amendment and void; that it does not, by its terms, apply to the organized practice of nudism; that it is not violated by nakedness on private property; that nudity, per se, is not obscene and every exposure of the person not indecent, particularly when the exposure does not offend the morals or sense of decency of those present and there are no other overt acts of indecency or obscenity aside from the bare fact of nudity. These points have been considered and answered in *People* v. *Ring,* 267 Mich 657 (93 ALR 993), and the cases therein discussed. The distinguishing feature in that case that there was testimony that one couple was engaged in what appeared to be improper conduct was not treated as of such controlling importance or so vital to the reasoning and holdings in this Court's opinion in *Ring* as to render them inapplicable here. Nor are they any less so because the statute then in effect prohibited designedly making an open or indecent or obscene exposure, while, by reason of subsequent amendment, it now is directed to knowingly making an open or indecent exposure. The comments on the *Ring Case,* commencing at 33 Michigan L Rev 936, do not persuade us that it ought now to be overruled. They do clearly indicate that *Ring* governs and applies to the factual situation presented here.

Though the term "exposure," qualified by such adjectives as "open," "indecent," "obscene," "immodest," or others of like import, be difficult of definition, the practice need not for that reason be permitted to run rife in Michigan. As indicated in *Ring* and cases therein considered, the average jury, composed of members of the community, can be expected to represent and embrace a cross section of the community thinking and moral standards which

are first reflected in the legislative enactment by the people's chosen representatives and, once again, in the statute's application to the facts of the case by the jury in arriving at its finding and verdict that certain conduct is violative thereof. That a jury found it to have been violated by defendants' exposure of their persons to the young children in this case and the exposure of the children themselves should be surprising to neither the pure in heart nor the lewd.

In *Roth* v. *United States,* 354 US 476 (77 S Ct 1304, 1 L ed2d 1498), the court considered statutes couched in the same general terms as those of the statute before us, the words "obscene" and "indecent" having been employed there, as here, without further definition. The court held that the statutes, applied according to the proper standard for judging obscenity, do not violate constitutional requirements of due process by failing to provide reasonably ascertainable standards of guilt. The court further held that obscenity is not, as defendants here claim for nudism, within the area of constitutionally protected freedom of speech and, finally, that the proper standard for judging obscenity, adequate to withstand the charge of constitutional infirmity, is whether, to the average person, applying contemporary community standards, the conduct in question has a tendency to excite lustful thoughts. The Michigan statute depends, for its force in proscribing indecent exposure, upon employing that precise standard which inheres, as we have seen above, in jury application of the statute to the facts at bar under court instructions entirely consistent therewith, as they were in this case. The logic of *Roth* with respect to inapplicability of the guarantee of freedom of speech is as persuasive in a consideration of the applicability of the right to peaceably as-

semble,* which defendants contend is violated by their convictions in this case. Nakedness has not, until now, been held an essential element of that right, and obscenity should prove as severe a limitation on that right as it was held, in *Roth*, to be on the right of free speech.

The claim of prejudicial remarks by the prosecuting attorney, entitling defendants to a new trial, is without merit, it neither appearing that the jury comprehended them nor that they were prejudicial in character.

The convictions should be affirmed.

CARR and KELLY, JJ., concurred with DETHMERS, C. J.

VOELKER, J. I dissent.

I dissent and vote to reverse and discharge these defendants for 2 reasons: first, because there was a total lack of proof (let alone proof beyond a reasonable doubt) of their guilt; second, because their conviction was the result of the use of evidence obtained by an illegal search.

The pertinent portion of the statute under which these defendants were prosecuted and convicted provides as follows: "Any person who shall knowingly make any open or indecent exposure of his or her person or of the person of another shall be guilty of a misdemeanor." (CLS 1956, § 750.335a [Stat Ann 1954 Rev § 28.567(1)].)

First we need more facts.

The people's proofs affirmatively show that when the police arrived the defendants were sitting or standing in various leisurely attitudes alone or in family and other groups at or near a depressed pool or pond; that there was not the slightest evidence by word or gesture of any act or sign of obscenity,

---

* See Const (1908), art 2, § 2.—REPORTER.

lewdness, indecency or immorality. Except for the fact that they were entirely unclothed they might have been any group of people enjoying a rural week-end outing. As one of the officers testified at the trial, "Well, some were standing, others walking around, some were sitting, children were playing on playground equipment."

It also seems pertinent to further identify these defendants to see what kind of people they are. The proofs show that they are all working-class people nearing or past middle age. At the time of the trial one defendant was 62, unmarried, and had worked 42 years continuously for one employer in an automobile factory; the childless married woman defendant worked in an Ohio supermarket; her 43-year-old husband had worked 16 years as a machinist for the same employer; the father of the 3 children and remaining defendant (whose wife has since died) had worked as an inspector in an automobile factory for 26 years. All had previously visited the camp and were nudists by conviction. With the exception of one defendant who had shortly after his discharge from military service been convicted on his plea of guilty to the larceny of chickens in Ohio back in the depression years, it appears that none had ever been arrested and convicted of any crime, sexual or otherwise, except occasional minor traffic offenses.

A portion of the unrebutted testimony of the proprietress of the nudist camp follows: This 140-acre nudist camp was the home of herself and her husband; they had lived there approximately 12 years and owned it for 14; they maintained printed regulations, including a rule against drinking or the bringing of intoxicants on the premises; violators of this rule were requested to leave and if they failed to do so the police were called, usually the State police. Police response to such calls had occasionally occurred while there were nude people in the area, none

of whom were ever disturbed or arrested by the police, the last call being several summers before; that otherwise there had been no complaints about the conduct of people in the camp in its 14 years of existence; that in all that time the proprietress had never seen or heard reported any improper actions by anybody on the premises, and that all of the present defendants had been there before.

While this nudist camp had operated for some 14 years it also appears that none of the various testifying officers who participated in the arrests had ever received or heard of any complaint against the place. The closest to a complaint was the testimony of a State trooper who said a few disgruntled motorists whom he had ticketed in the area had occasionally twitted him about the place. So the presumably outraged community boils itself down to a knot of determined police officers who for some undisclosed reason after 14 years finally made up their minds and set a trap to tip over the place. And tip it they did.

I now turn to the legality of the search.

In his opinion my Brother states that prior to the day in question 2 State police officers had "gone on business" to the nudist camp and there saw certain nude persons and later obtained warrants for their arrest and that one of these officers had still later gone to the camp with a third officer to serve these warrants on the day that these present defendants were observed, photographed and arrested.

In view of what follows I must point out that my Brother is somewhat in error: on the earlier "business" visit to which he alludes only 1 of the 2 police officers was a State policeman; the other was a detective on the Battle Creek city police force then physically out of the city of his employment. There is another small error: both officers had not earlier "gone on business" to the nudist camp; this claim was ad-

vanced on behalf of but 1 of them: to the visit of the city police officer who was out of his bailiwick; the State police officer candidly testified that he accompanied the other city police officer there for the avowed purpose of getting evidence against any nudists he might then happen to see.

In view of the serious question in this case on the issue of illegal search and arrest we shall look a little further into the precise nature of this claimed "business." The State policeman on his cross-examination at the preliminary examination of these present defendants testified that he had gone there on June 15, 1956, with a detective of the Battle Creek police "on a matter that he [the latter] was concerned with." The instant arrests were made on June 30th. This exchange followed.

"*Q.* Were you there [on June 15th] for the purpose of obtaining evidence?

"*A.* I was with Lt. Schoder [the Battle Creek detective] on a matter that he was concerned with and I had my camera with me and it was my every intention to gather evidence if there was any showing of indecent exposures."

At the trial this same officer testified that he went with officer Schoder "more or less as company for him."

The fact is that the record in this case is barren of any testimony that these 2 officers went to the camp on June 15th for any other purpose than as an initial step in a plan to conduct a later mass raid on the place. Lt. Schoder (the Battle Creek officer who had ostensibly "gone on business" to the camp on June 15th) testified at both the preliminary examination and the trial of these defendants. Nowhere does he state or remotely imply that his so-called "business" trip to Sunshine Gardens was ever anything but solely to get the goods on the nudists and

help arrest them. Thus on cross-examination at the preliminary examination:

"*Q.* You accompanied Detective Whalen on the 15th of June?

"*A.* Yes.

"*Q.* And you accompanied the police officers in the raid on the 30th of June?

"*A.* I accompanied them out there to serve these warrants.

"*Q.* I didn't ask you your reason. But you accompanied them?

"*A.* You said on the raid. The reason I went was to serve the warrants. I was going out to see if I could identify [naming the 3 June 15th nudists].

"*Q.* You weren't interested in any raid?

"*A.* I was interested in locating those people because we had the warrant.

"*Q.* And you just pitched in and helped when you got there?

"*A.* That's right."

So it develops that the only real or claimed "business" that this Battle Creek police officer had out at this remote and secluded nudist camp located entirely out of his bailiwick was in turn to "accompany" the man who was "accompanying" him, that is, the State police detective whose main avowed purpose or "business" in going there was somehow to find some way to get evidence on any nudists.

We should add that even if Lt. Schoder had had some legitimate business at the nudist camp on June 15th in our opinion that would still not legalize the search then made or the evidence obtained by Detective Whalen on that date (upon which he later "swore out" the warrants he ostensibly sought to serve on June 30th), else by the same reasoning police officers need henceforth merely arrange to accompany plumbers or inspectors or utility meter men, say, upon suspected private premises and thereafter

legalize their then or subsequent illegal searches and arrests under the guise that they had originally accompanied someone there on "business." This cannot be sound law.

In designating the affair of June 30th as a raid we are merely adopting the frank terminology of officer Whalen during the preliminary examination and also at the trial. That he had himself a nice problem in successfully penetrating this nudist camp he conceded with admirable candor. He further testified at the examination that the camp was "a dense wild area;" that there was "some question about the gathering of evidence out there;" and that he and his fellow officers had discussed ways and means of solving the "problem in gathering evidence" and of obtaining pictures because of "the fact that it was secluded and it was difficult to get on the property without trespassing."

Further indication that the ostensible warrant-serving party of June 30th was in reality a planned raid for new and bigger game—with the warrants for other persons serving as the legal foot-in-the-door—is the fact that the 3 carloads of cruising police officers joined the first carload of 2 warrant-serving officers within less than 2 minutes of a radio call. Our experience with raids upon nudists' camps is mercifully limited, but we very much doubt that it would take 4 carloads of police officers to gather in the 3 nude defendants therein named. It seems most unlikely that the arrest of 3 naked nudists (one of them a woman) could have presented any such grave problems either of subjugation or of potential danger to the police.

To say that the admitted raid and mass arrests on June 30th was legalized under the guise of serving warrants on other people obtained by an illegal visitation on June 15th is a new wrinkle in Operation Bootstrap. The whole business of serving the

warrants on June 30th appears on this record to have been a clumsy and transparent attempt to get around the vexing police problem of illegal search. Moreover (and further demonstrating the apparent police strategy), even assuming arguendo that the June 15th "business" visit of the 2 officers was legal —as the people claim—they (or at least the State policeman present) could plainly have then arrested the 3 nudists they then saw on the premises for a misdemeanor committed in their presence (CL 1948, § 764.15 [Stat Ann 1954 Rev § 28.874]), always assuming, as they and the people do and as we do not, that the deportment of the defendants then constituted a violation of the "indecent exposure" statute.

That one or both of these officers may have been disappointed over the results of their earlier alleged "business" visit and have wanted to wait for a bigger week-end bag, including children (June 15th was a week day; June 30th fell on a Saturday), is of course sheer speculation, but the fact is that the ultimate lack of warrants for the arrests of *these* defendants did not appear measurably to deter these very same officers in making their mass arrests without warrants on June 30th. (Mrs. Weissenborn took sick and died after her arrest and before this appeal; the cases of certain other nudists were continued; and it appears that still others were released after questioning.)

Despite all this my associate devotes but part of 1 sentence in his opinion to the question of the legality of the search and arrest—merely to note that the defendants had raised the issue. Yet to say that the search and arrests here were illegal is an understatement. It was indecent—indeed the one big indecency we find in this whole case: descending upon these unsuspecting souls like storm troopers; herding them before clicking cameras like plucked chickens; hauling them away in police cars and

questioning them for upwards of 5–1/2 hours and taking still more pictures; and then, final irony, swearing out warrants that *one of their own number* was the aggrieved victim of an indecent exposure— of which more presently. If this search was legal then any deputized window-peeper with a ladder can spy upon any married couple in the land and forthwith photograph and arrest them for exposing themselves indecently to him.

In *People* v. *Marxhausen*, 204 Mich 559 (3 ALR 1505), the warrantless police raided the defendant's island home in the Detroit river during his absence and found and removed contraband liquor from his home, from an improvised cellar, and also from "other points on the premises." In an eloquent and resounding opinion Mr. Justice FELLOWS struck down the search (pp 562, 563) and among other things had this to say (after quoting our State constitutional provisions* against unreasonable searches and seizures and the "due process" provision):

"Like provisions are found in the Fifth Amendment to the Federal Constitution. Similar provisions are found in the constitutions of the various States of the Union. By these provisions the rights of the individual are secured; the provisions of the Federal Constitution securing the citizen from arbitrary, unlawful conduct on the part of the Federal government and its officers, and the provisions of the State constitutions securing the citizen from arbitrary, unlawful conduct on the part of the State and its officers. These provisions not only secure the individual in his person, his home, and his property from invasion through unbridled legislation, but they also secure the individual in his person, his home, and his property from invasion through unbridled and unrestrained executive or administrative will.

---

* Const (1908), art 2, §§ 10, 16.—REPORTER.

It ought not to be necessary to recall the fact that it is of the essence of a free government that the individual shall be secure in his person, his home and his property from unlawful invasion, from unlawful search, from unlawful seizure. The writing of these provisions into the Federal Constitution, into every constitution of every State in the Union was not an idle ceremony. With a clearness of vision our forefathers provided for a lawful search and seizure, one supported by oath or affirmation, describing the place to be searched and the person or things to be seized; and in the same section safeguarded the rights of the individual by inhibiting unreasonable and unlawful search. They provided an orderly manner for search and seizure and prohibited all others."

He then (p 565) quoted from the terse Chatham:

"'Every man's house is called his castle. Why? Because it is surrounded by a moat, or defended by a wall? No. It may be a straw-built hut; the wind may whistle around it, the rain may enter it, but the king cannot.'"

He concludes thus (pp 566, 567):

"These events which we have but given in outline occurred within the memory of the men who formulated and adopted the Fourth Amendment. In clear and unmistakable language these men wrote into the fundamental law of the nation to be afterwards incorporated into the fundamental law of the various States of the Union the safeguard against unlawful and unreasonable search and seizure of the person and property of the citizen, irrespective of whether such unlawful and unreasonable search and seizure had the sanction of legislative approval or rested in the arbitrary will of the executive and administrative arm of the State. Does the search of defendant's premises and the seizure of his property in the instant case offend the rights secured to him by this provision of the fundamental law of the State? *These officers had no search warrant issued upon*

*oath or affirmation, no search warrant of any kind.*
*They entered the home of defendant by command of*
*no court, they searched his premises by virtue of no*
*process.* They justify, if at all, under administra-
tive will and mandate not recognized by the Consti-
tution, and unauthorized in a government of laws.
That 'the end justifies the means' is a doctrine which
has not found lodgment in the archives of this Court.
The search and seizure detailed in this record was
an unauthorized trespass and an invasion of the
constitutional rights of this defendant.   [Emphasis
added.]

"These rights of the individual in his person and
property should be held sacred, and any attempt to
fritter them away under the guise of enforcing
drastic sumptuary legislation (no matter how bene-
ficial to the people it may be claimed to be), must
meet with the clear and earnest disapproval of the
courts."

This is the case our Court pays scant lip service to
in the *Ring Case** (p 660) and then proceeds to
ignore.  We now find that an island home and prem-
ises was immune from warrantless search in *Marx-*
*hausen* (where no question existed about the illegal-
ity of what was found) but not a nudist camp as in
the *Ring Case* and in this case—where grave ques-
tions exist as to guilt.  We believe this is to invoke
the doctrine of "the end justifies the means" so elo-
quently warned against in *Marxhausen.*  We further
believe that this, as in *Marxhausen,* is to fritter away
the rights of the individual in his person and prop-
erty under the lofty guise of benefiting the people.
It seems that we are now prepared to burn down
the house of constitutional safeguards in order to
roast a few nudists.  I will have none of it.

If these convictions can stand, based upon this
search, then police officers may henceforth raid at
will the locker rooms of clubs, art classes and ex-

* *People* v. *Ring,* 267 Mich 657 (93 ALR 993).—REPORTER.

hibitions, sunbathers at homes and at picnics and beaches and virtually any private or secluded place where the officers may hope to dredge up some "dirt" and whenever they may decide by barracks-room debate that a suspected practice is immoral or indecent. It would be to say any nudity anywhere becomes both open and indecent regardless of the circumstances and simply because some irritated or overzealous police officers may think so. It would be to impose not the moral standards of the community but the moral standards of the patrolman on some of the most intimate and private concerns of human life.

If the opinion of my Brother prevails we will have found a new way to get around irksome constitutional inhibitions against unreasonable searches and seizures: 2 police officers will make a visit to such private premises as they may in their wisdom conclude they want to get the goods on; they will pretend that 1 or both of them have some "business" there; if pressed they will admit that their real business was to accompany each other; and, finally, this explanation will so completely disarm and satisfy this Court that, without any discussion, we will categorically hold that the search and subsequent use of evidence obtained thereby is entirely legal. To such a proposition I will not be a party.

I say and hold that the search and arrests in this case were unreasonable and unlawful. I shall presently attempt to show that even if the officers were there legally that what the search disclosed did not in these circumstances constitute a violation of this statute. Before doing so I shall discuss another ground for reversal.

The charging part of the various original complaints and warrants against these defendants (their cases were consolidated for preliminary examination and trial) named one or the other of individual raid-

ing officers as the victim of the indecent exposure. These defendants were examined under such complaints and warrants and were thereafter bound over to circuit court for trial upon a testimonial record addressed to those complaints and warrants. In circuit court (and for the first time) informations were filed against them as follows: that each did "in the presence and within the view of divers good people of this State, unlawfully and designedly did make an open, indecent and obscene exposure of his person, by then and there standing, naked and uncovered to the view of said persons for a long space of time, to-wit: several minutes, to the great scandal of said people, and to the manifest corruption of their morals."

Entirely aside from the fact that there is not a shred of testimony in this long record that anyone was ever scandalized or corrupted by what took place, I consider this circumstance reversible error. So far as this record discloses the informations appear to have been changed by the prosecuting attorney without any prior leave of court; consequently these defendants were never examined or given an opportunity to be examined on the offense charged in the filed informations. This was not a routine change to correct an obvious mistake or typographical error in the complaints and warrants; this was to our mind a basic change and shift from the whole tenor of the earlier documents.

It is no answer to say that the defendants did not specifically raise the question below or here. Under our law they were entitled to a preliminary examination on the sworn complaints and warrants upon which they were arrested. They got it. If for reasons of doubt or expediency the prosecuting attorney later had serious second thoughts about the utility or wisdom of naming only one or the other of the raiding officers as the morally offended one, we

think he should at least have called the change to the attention of court and counsel so that either a formal amendment could have been moved for and argued or so that counsel could timely have moved either for a continuance or, more likely, for a remand for new examination under the changed informations. We do not raise or pass on the question of the sufficiency of the informations; the point is that they differed materially from the complaints and warrants.

These people were entitled to an examination as to the identity and knowledge possessed by these anonymous new aggrieved citizens who for the first time were alluded to in the changed informations. They did not get it. They were never given a chance to be confronted by or to examine their new and nameless accusers or to prepare for trial on the basis of their possible testimony. Criminal prosecutions in this State are initiated by sworn complaint (followed by warrant) made by persons possessing knowledge of the facts; they are not initiated by informations filed by prosecutors based upon hearsay. Put another way, these defendants were tried upon informations upon which there existed no corresponding complaints and warrants. We think this circumstance entitles them at least to a new trial.

I now pass to the basic question in this case: of whether—all question of search aside—any violation of this statute occurred.

---

Lest I henceforth be heralded as the patron saint of nudism (which I probably will be anyway), I hasten to preface what follows by stating that I am not a disciple of the cult of nudism. Its presumed enchantments totally elude me. The prospect of displaying my unveiled person before others, or beholding others thus displayed, revolts and horrifies

me. I think these people have carried an arguably valid basic idea (the deliberate de-emphasis of the prevailing Western body taboo, with the anticipated lessening and ultimate disappearance of the undoubted eroticism frequently attendant upon such taboo— that is, the very opposite of indecency) to excessive lengths.

Having said all that, I have at once veered to the heart of this case. It is this: whatever I or my associates (or the circuit judge or the prosecutor or the police, for that matter) may personally think of the practice of nudism has nothing to do with the case. More controlling is the fact that there are a number of earnest people in this world (including these defendants) who do subscribe to organized nudism and who think that it is morally, mentally and physically healthful. But we need not speculate on or defend or attack the philosophy of nudism. The question before us is much simpler. Were these defendants guilty of making an indecent exposure? I say no.

It is said that there are hardy bands of sincere and earnest folk among us who likewise insist that all mental, moral and physical health depends absolutely upon the regular consumption of vast quantities of bran. Others possess a similar passion for goats' milk. Few molest them or even bother their heads about them unless they try too strenuously to impose or inflict their queer beliefs upon those who happen to loathe these items. Thus, on the facts before us, do I equate the criminality of private social nudism—at least so far as a violation of this statute is concerned. Private fanaticism or even bad taste is not yet a ground for police interference. If eccentricity were a crime, then all of us were felons.

My Brother plants his case largely upon the Michigan *Ring Case* and the United States supreme court

*Roth Case** in affirming these convictions, writing as follows:

"Though the term 'exposure', qualified by such adjectives as 'open', 'indecent', 'obscene', 'immodest', or others of like import, be difficult of definition, the practice need not for that reason be permitted to run rife in Michigan."

Is he speaking of indecent exposure or of nudism? He does not say. Whether of one or the other, there is no evidence in this record or elsewhere that either has been or is running "rife" (that is: prevalent, existing generally) in Michigan. If he means to equate one with the other (as he seems clearly to mean) then he has begged 1 of the 2 large issues in this case, entirely ignoring the other: the question of search, and I cannot agree. This is to indulge in a presumption of guilt, not of innocence; to pass a moral judgment; to assume that a statute means what one may privately want it to mean or thinks it should mean—regardless of the facts. This is further to say that all nakedness, whether public or private, whatever the circumstances, is always indecent and criminal. I cannot agree.

From the undoubtedly valid premise that some degree of nudity must always be involved in order for an exposure to be indecent, the *Ring Case* and the opinion of my Brother in this case have leapt to the erroneous conclusion that nudity is synonymous with indecency; the opinions imply that the more nudity present the more indecent the exposure. Both cases proceed upon the basic assumption that nudity in itself is obscene or indecent. As I shall presently undertake to show, this is a demonstrable fallacy. If this assumption were valid few artists could continue to work from live models, or, veering somewhat

---

* *Roth* v. *United States*, 354 US 476 (77 S Ct 1304, 1 L ed2d 1498).—REPORTER.

to a related field, the curators of our art galleries and museums would have to turn to the cultivation of fig leaves; and that stalwart badge of middle-class respectability, the National Geographic magazine, would be banished from the hearth to the censor's shears.

My Brother further writes as follows:

"That a jury found it [the statute] to have been violated by defendants' exposure of their persons to the young children in this case and the exposure of the children themselves should be surprising to neither the pure in heart nor the lewd."

For all its emotional and rhetorical appeal, this passage states less a fact than a resounding moral judgment. Moreover it carries implications that are simply not so: it implies that these defendants were charged with exposing themselves to children and, also, with exposing the children, whereas we have seen that the complaint and warrant charges only indecent exposure by these defendants before a named police officer and that the subsequent informations named nobody; it implies that the jury answered a special question or brought in some sort of special verdict, whereas the verdict was simply a general one of guilty; and it implies that the children testified at the trial, whereas they did not and moreover there is no testimony from any witness that they or anybody was scandalized or corrupted by what he saw. If the passage discloses anything it is why my Brother thinks these defendants should stay convicted—because children were present. Now concern for little children is always touching and understandable; and my colleague possesses no exclusive franchise on it; but if these convictions must be affirmed simply because my associate thinks the prosecutions and the jury verdict may have been inspired by a concern for children, we suggest that

there might have been other statutes and apter procedures available to such an end. Moreover, and whether other courses were available or not, the presence of children constituted no valid ground for making an illegal search or for arresting these defendants for an exposure which neither the proofs show, nor obviously none of the participants regarded, as indecent.

To my mind the presence of the children, far from accentuating any indecency, was itself additional proof and insurance that no indecency or immorality was contemplated or intended by these defendants. It is particularly monstrous to think that their parents would intentionally have exposed their children to that which they thought was indecent, and if they nevertheless had, which the people seem to claim, then the prosecution should be censured for not taking far more drastic action to punish all concerned and to save the children from any repetition. So much for the presence of children in this case.

If one concedes (which I do not) that the private practice of social nudism constitutes a violation of the "indecent exposure" statute, the legality of the search phase of the *Ring Case* cited by my Brother can at least arguably be rationalized (something which the Court there did not attempt to do) and distinguished from this case as follows: both the record and report in the *Ring Case* show that the officers there—and while entirely off the premises— were able to observe a naked man and woman, the former feeling the latter's privates. If the officers could behold such a spectacle without trespassing, presumably so could others, and since few would be hardy enough to argue that such a public display did not constitute an act of indecent exposure, then the officers perforce were seeing an actual misdemeanor being committed in their presence for which they could make a lawful arrest without a warrant.

And if while thus upon the premises bent upon making that arrest (but not some 2 weeks later, as here) they saw thereon still another person committing a misdemeanor (the naked nudist camp proprietor in the *Ring Case*) it would at least be arguable that under such circumstances the arresting-bent police may have had a right also to arrest this brand new misdemeanant. The search and arrest as to him would at least have had some veneer of legality— something entirely lacking in this present case, where all stages of the search were conceived and born in illegality.

If instead the *Ring Case* means (and unfortunately the Court's murky opinion there is susceptible of such interpretation) that police officers may without any color of authority conduct a raid upon private property upon mere suspicion that a misdemeanor theretofore entirely out of their presence may be taking place (which is our case), then the case is utterly bad law, never followed in Michigan before or since, and the *Ring Case* must be overruled.

One trouble (among others) in the *Ring Case* was that it neglected adequately to distinguish between the question of illegal search and arrest and the *further question* of whether private nudism was or was not a violation of the then version of this statute. We were then evidently so determined to smite nudism that we virtually overlooked the real issue on the search and flatly assumed guilt. This short cut to guilt is accentuated in the present opinion from which I dissent—where the grave question of the legality of the search is barely alluded to and the defendants' guilt is also flatly assumed.

The *Roth Case* cited by my Brother had to do with the mailing and public dissemination of allegedly obscene printed matter. My Brother neglects to point out that in the *Roth Case* there was a blazing dissent by Justice Douglas, joined in by Justice

Black, or that Chief Justice Warren, while concurring in the result, filed a separate opinion expressing sharp concern over the wisdom of the broad language employed in the majority opinion. But most of all my Brother overlooks the important fact that the *Roth Case* was concerned with the *public* dissemination of allegedly obscene writings, a situation which might have had the persuasiveness of some analogy here if we were concerned with a *public* display of their nudity by the defendants in this case (as though they had boldly walked down the main street of Battle Creek), but certainly not to a private practice of their belief in nudism in a place so remote and secluded that the prosecuting officials had to resort to the tactics displayed in this case in their efforts to try to get any evidence on them.

My Brother would swallow whole the "test" of the *Ring Case*—that the average jury, composed of members of the community, has an instinctive realization of what constitutes a violation of the act—attempting to tie it up with some broad dicta in the majority opinion in the *Roth Case* about "contemporary community standards" and similar language impliedly questioned by the Chief Justice and flatly rejected by 2 of the ablest justices. We have already pointed out why we think this language in the *Roth Case* (and the same would apply to the *Ring Case*) could not apply to the elaborately private conduct of these defendants in this case. Although I say that such a test is in any event inapplicable to these defendants, since my Brother nevertheless seeks to apply it, we will see what Mr. Justice Douglas has to say about such a similar test in the *Roth Case* (*Roth* v. *United States*, 354 US 476, 512 *et seq.*):

"Any test that turns on what is offensive to the community's standards is too loose, too capricious, too destructive of freedom of expression to be squared with the First Amendment. Under that test,

juries can censor, suppress, and punish what they don't like, provided the matter relates to 'sexual impurity' or has a tendency 'to excite lustful thoughts.' This is community censorship in one of its worst forms. It creates a regime where in the battle between the literati and the Philistines, the Philistines are certain to win. If experience in this field teaches anything, it is that 'censorship of obscenity has almost always been both irrational and indiscriminate.' Lockhart & McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn L Rev 295, 371. The test adopted here accentuates that trend.  *  *  *

"The legality of a publication in this country should never be allowed to turn either on the purity of thought which it instills in the mind of the reader or on the degree to which it offends the community conscience. By either test the role of the censor is exalted, and society's values in literary freedom are sacrificed."

We join with Justice Douglas in questioning the wisdom of such a rule even in those "public" situations where it might otherwise be said properly to apply, but we utterly reject any such test or rule that would make a juryman the omniscient community litmus of that to which, by hypothesis, neither he nor the community at large has ever been exposed. If trained judges on this Court can disagree on the applicability of this statute to these facts, we can see no merit and much danger in a rule that would ignore and reject our differences in favor of the presumably infallible intuitions of the average lay juryman; and especially is this so in situations where, as here, the moving facts are undisputed and the big question resolves itself largely into one of statutory interpretation.

If private nudism is to be banished in this State as contrary to the public morality we think the attempt must be made by the legislature and not by

the police or by this Court, and certainly not by stretching out of shape the law of search and seizure and the proper meaning of this statute. That segments of the legislature itself entertained doubts that the previous version of this statute ever applied to the practice of nudism is shown by the fact that long after the *Ring Case* and only about a year before the arrests in this case it drafted a new statute aimed expressly at banishing nudism. The house committee to which the bill was assigned appears to have refused to report it out on the ground that existing laws were sufficient. The attorney general (now Mr. Justice Kavanagh) agreed, basing his decision squarely on the then "indecent exposure" statute and the *Ring Case*. (1955 OAG, p 234.) Needless to say this Court is not bound by the attorney general's interpretation of statutes or of our decided cases, nor is that officer at liberty—in areas where we have written—to interpret the law contrary to his best guess as to the meaning of our utterances, however wrong those utterances and regardless of how that officer might or might not otherwise feel. The most this tends to show is that the prosecutions here were probably brought in apparent good faith—beyond showing, as noted, the doubt that existed in the legislature itself.

Our decision in the *Ring Case* has been roundly criticized in 33 Michigan L Rev 936, the writer pointing out that the "disconcerting" result there reached was not only hard to reconcile with the then recent *Burke Case** (another "nudist" case where on substantially similar moving facts under a similar statute the New York court reversed conviction), but that the *Ring Case* stands virtually alone in its contrariness to the clear weight of authority throughout the country. "The Michigan court is seemingly

---

* *People* v. *Burke,* 243 App Div 83 (276 NYS 402), affirmed, 267 NY 571 (196 NE 585).

without precedent," the comment concludes (p 941), "in holding that an indecent exposure occurs and the community sense of decency is offended regardless of the accompanying circumstances. All cases have tacitly implied that what makes the act offensive is the relationship which it bears to the public in general or to the people there present, and some cases have expressly pointed this out. (Citing cases.)"

When student editors start sniping at our decisions with such deadly accuracy, perhaps the time has come for all of us to take a second long look at the *Ring Case.* Instead of sniping I prefer using in this instance a blunt instrument. The plain fact is that the *Ring Case* is less a legal opinion than an exercise in moral indignation. An aroused judge has instead used this Court as a platform from which to tell the world what *he* thinks about such queer new-fangled shenanigans as nudism. Now moral indignation is all very well, and many of us might do with more of it, but to indulge in it at the expense of basic constitutional rights and individual liberties can be an expensive and dangerous luxury. Moral indignation is a poor substitute for due process. The embarrassing *Ring Case* is hereby nominated for oblivion.

Finally, neither the *Ring Case* nor my Brother's opinion in this case makes any effort to dredge below the surface and grapple with the probable meaning of this statute. The effort is long overdue and I shall now proceed with the grappling and dredging. I shall pose some hypothetical situations in an attempt to show what this statute means—and also what it does not mean. No effort will be made to cover all possible situations nor shall we seek exactly to define or limit indecent exposure (which would probably neither be possible nor desirable); and while we concede that there are doubtless certain twilight areas difficult of pragmatic definition,

we equally insist that such areas are relatively narrow and that there exist and it is possible to delineate broad zones of behavior lying clearly within or without the proper purview of this statute.

1: Richard Rowe is the drum major of his college; it is the half time of the big homecoming football game; the band is swinging into the traditional college march. The goose-stepping drum major is strutting with peacock magnificence; all eyes are upon him. Suddenly his skin-tight trousers rip and let go unmistakably exposing his nude person to 50,000 cheering fans. Would this be an indecent exposure under our statute? Clearly not. And why not? Because the exposure was obviously accidental, poor Richard did not mean it, indecently or otherwise—and the crowds of hysterically mirthstricken beholders would not possibly take it that way. Any such prosecution would be laughed out of court.

Comment: We note that the unmistakable exposure here was as public and open as one could readily imagine, but the hapless Richard is guiltless of indecent exposure for at least 2 reasons: he did not mean it that way and it was not taken that way.

2: Richard Rowe is a chronic sleepwalker. One night at midnight he goes for a somnambulistic stroll and walks naked down to the corner mailbox to mail an imaginary letter. A strange woman beholds him and screams for the police. They arrive and take poor Richard to the station. Upon police confirmation of his affliction would he be prosecuted for indecent exposure? Probably not, and if he were any court or jury in the land would doubtless let him go. Why? Because he didn't mean it, there was no intention of indecency, he didn't even know what he was doing.

Comment: Here the woman "exposee" was no less shocked and horrified than if Richard were a lusting

pathological exhibitionist who carefully planned it that way—but still there is no valid case because her sense of shock did not combine with his conscious intent to indecently expose his person to her. We are now ready for a tentative definition: The statute envisages a combination of 2 things: a reasonably inferable indecent intention by the exposer as well as a reasonably-to-be expected reaction of shock and shame on the part of the probable exposee.

3: Richard Rowe does the same thing as in example 2 except that this time he carefully planned it that way. The same woman beholds him. Is he guilty of indecent exposure? Most certainly yes.

Comment: Where the exposure is openly, knowingly and deliberately made before others who may reasonably be expected to be shocked by the performance, the exposure is clearly indecent.

4: Richard Rowe intentionally does the same as in example 3, but the woman is stone blind and being led by a seeing-eye dog and no one else sees him as Richard scampers home. Was there an indecent exposure? Probably not, because there was no exposee present who was conscious or aware of what would otherwise have clearly been an indecent exposure.

5: The police find sleepwalker Richard Rowe of example 2 wandering aimlessly about the public streets.

6: The police find naked Richard Rowe the non-sleepwalker flitting from behind tree to tree along a residential street but with no one else present.

7: The patrolling police behold Richard Rowe standing in silhouette with his privates exposed in the bedroom window of his lighted home.

Comments on 5, 6 and 7: No indecent exposure in 5 (as in 2) because no intention. An open and indecent exposure in 6 and 7 because of the deliberate intention to indecently expose the person and the

reasonable chance that he would be seen by a passer-by who would be shocked and outraged by the sight.

8: Richard Rowe embraces nudism and, along with the defendants in this case, parades in a nude missionary expedition down the main street of Battle Creek and all are gathered in by the police.

Comment: Clearly guilty of indecent exposure because the exposure is openly and knowingly made before persons who may reasonably be expected to be shocked and outraged by the performance *and there is no question of illegal search or arrest involved.* The claimed pureness of heart or sincere beliefs of the exposers here will not save them because they will be deemed to know that the probable beholders (unlike those at a private nudist retreat) would not share their beliefs and would instead be shocked by the sight.

9: The police place a ladder against Richard Rowe's home and climb it and look through the curtained window into the bathroom where he and his wife and 3 small children are naked and having sun lamp treatments or taking baths.

Comment: No crime of indecent exposure because though there is a common naked exposure of mixed sexes knowingly and openly made, none of the participants meant or took it indecently and, further, any other persons who might reasonably be expected to see them and be shocked thereby could only do so by trespassing or making an illegal search.

10: Our present case.

Comment: No crime of indecent exposure for precisely the same reasons as in example 9 above.

---

We have now seen that the statute envisages a combination of 2 things: an actual or reasonably inferable indecent intention by the exposer joined with a reasonably-to-be-expected reaction of shock

and outrage by the probable or potential exposees. We have seen that the absence of one or the other element can be fatal to guilt. Where, as here, both elements are missing and neither the exposers intend their exposure indecently nor do the exposees remotely take it that way (of which there is not a contrary shred of proof in this record) then it follows all the more that there can be no crime of indecent exposure under our statute.

The crime of indecent exposure naturally suggests the presence of an "exposee" as well as an exposer. Who were the exposees in this case? The raiding and warrantless police? The complaints and warrants say yes, but, as noted, the information either says otherwise or leaves the issue in doubt. We recoil from the idea that police can invade private premises and (after stoically taking photographs) claim they were shocked by what they beheld. Was it the proprietress, Mrs. Adams, who helped run the place for so many years? The question answers itself. Was it the defendants and other adult nudists? We are not told, but again we find it hard to swallow the idea that dedicated and convinced participants in the practice of private social nudism—themselves nude—may become suddenly scandalized or corrupted by the sight of their companions and turn around and prosecute each other for indecent exposure.

Perhaps (along with my Brother) the people meant the now motherless Weissenborn children. They were mercifully spared participation in the trial of this case, but to surmise without a shred of evidence that they were corrupted by seeing their mother and father without any clothes (along with some other mostly middle-aged people some distance away) is to gratuitously invest childhood with evil and erotic tendencies before mere nakedness and to reject the observations and researches of virtually

every anthropologist and sociologist who has contributed to the literature of human mores. See Sumner, Folkways, under index entry "Nakedness." Also, see 33 Michigan L Rev 936 for similar references.

Guilt or innocence of indecent exposure is not a matter of measuring the amount of human flesh exposed; one does not caliper the revealed epidermis and certify guilt as increasing by the square inch; the indecency of an exposure is always a matter of intent to be gathered from all of the circumstances. The plain fact is that often the less the exposure the more plainly indecent it becomes, *by that very circumstance alone;* the plain fact is that usually there is involved an aggressive and unmistakably erotic attempt to focus the attention of others solely on the sexual organs of the exposer, and, as any weary patrolman knows (if some judges may have forgotten), most usually on a certain engorged portion of the male anatomy. To link these poor defendants, however deluded, with such gross and panting immorality is a kind of back-handed indecency in itself.

Most simply put, then, where the exposure is neither meant nor taken as indecent there cannot be a violation of this statute. Unless this over-long opinion were written entirely in vain, I should by now have demonstrated at the very least that a reasonable doubt exists that this statute applies to the conduct of these people. It is elementary under our Anglo-American legal system that where such a doubt exists the vote must be for innocence.

In a world locked in a death struggle between the David of democracy and the Goliath of giant totalitarianism, it serves David illy for the court of last resort of one of democracy's greatest industrial bastions—the State of Michigan—to put its stamp of approval on such a dubious departure from our traditional procedures and historic safeguards

against invasion of our individual rights—the right to be secure from unreasonable search and seizure and the right in all criminal proceedings to receive the benefit of any reasonable doubt.

That these defendants here may have been raided, arrested and prosecuted from the loftiest of motives is no answer; it is no excuse that the bold invasion of individual rights and liberties unfolded here was motivated by pureness of heart. These defendants can take little comfort that they were prosecuted with love and their conviction possibly accompanied by a warm glow of community virtue. The busiest snoopers and moral vigilantes among us are doubtless convinced of 3 things: of their own unfaltering rectitude; that what they do is always for our own best good; and that any among us who dare question the legality of their activities are soaked in sin.

For all practical purposes this is probably the court of last resort for these defendants; we are their last hope. Whatever we may privately think about the practice of nudism should not cloud our decision in this case. Our reversal of these convictions is no more an indorsement by us of nudism than our occasional necessary reversal of a murder conviction constitutes a judicial indorsement of murder. If nudism must go in Michigan it must go by right not might. The bald inescapable fact is that the prosecuting officials in this case badly overreached themselves. The time has now come for us to say so.

The convictions here are reversed and the defendants discharged. All film and prints of the defendants in the possession of the prosecution and police shall be returned forthwith to their counsel.

Smith and Black, JJ., concurred with Voelker, J.

EDWARDS, J. (*concurring*). I concur with Mr. Justice VOELKER's result in this case, but only upon the first of the grounds which he discusses pertaining to illegal search and seizure. The officers who made these arrests did so after entering upon property privately owned and posted as "private." Their justification for their entrance was a claimed attempt to serve warrants for arrest previously procured upon sworn information. The record discloses 2 warrants based upon a complaint made on June 15, 1956, pertaining to a claimed indecent exposure of the persons named on that same date.

. The record discloses no attempt to serve these warrants or to arrest these people on that date or subsequently until June 30th when the entry complained of by appellants was made by the officers. It should be noted that none of the defendants-appellants in this proceeding are identified as those for whom warrants were issued. Under these circumstances, I agree with Justice VOELKER that the warrants were obtained as a subterfuge for gaining entrance and without any purpose of making the specific arrests for which they called. See *Gouled* v. *United States,* 255 US 298, 305 (41 S Ct 261, 65 L ed 647):

"The prohibition of the Fourth Amendment is against all unreasonable searches and seizures and if for a government officer to obtain entrance to a man's house or office by force or by an illegal threat or show of force, amounting to coercion, and then to search for and seize his private papers would be an unreasonable and therefore a prohibited search and seizure, as it certainly would be, it is impossible to successfully contend that a like search and seizure would be a reasonable one if only admission were obtained by stealth instead of by force or coercion."

It may, however, be argued that the invasion of these private premises by the officers was justified

under the "open field" rule. *Hester* v. *United States,* 265 US 57 (44 S Ct 445, 68 L ed 898). See annotation, 74 ALR 1418, 1454.

My Brother's opinion has provided sufficient facts to indicate that the officers in question, absent lawful warrant, did illegally invade the curtilage of the dwellings here concerned.

In *People* v. *Taylor,* 2 Mich 250, 252, this Court, adopting a quotation from Chitty,* has thus defined "curtilage":

"In its most comprehensive and proper legal signification it includes all that space of ground and buildings thereon, which is usually enclosed within the *general fence,* immediately surrounding a principal messuage, out-buildings and yard, closely adjoining to a dwelling-house, but it may be large enough for cattle to be *levant* and *couchant* therein."

If a man's house be his castle, the most casual view of the premises involved here, as portrayed in photographic exhibits, indicates the scene of this arrest was the courtyard.

This record convinces the writer that the arrests were made in violation of article 2, § 10, of the Michigan Constitution (1908).

KAVANAGH, J., did not sit.

---

* Chitty, The Practice of Law (2d Am ed), p 175.—REPORTER.